Taft, J.
 

 Under Sections 614-44 and 3982, General Code, the city fixed by ordinances the rates that the gas company might charge or collect for supplying gas in Cincinnati for the two-year period from June 30, 1944, to July 1, 1946, and for the two-year period from June 30, 1946, to July 1, 1948. Section 614-44 provides for a written complaint such as was made by the gas company after passage of each of the ordinances, and for a hearing by the commission on each such complaint.
 

 Under Section 614-46, General Code, if the commission, after such a hearing, is of the opinion that the ■rates so fixed by ordinance are or will be unjust or unreasonable or insufficient to yield reasonable compensation for the public utility service, the commission shall fix and determine the just and reasonable rates to be charged or collected during the period fixed by the ordinance and order them substituted for the ordinance rates.
 

 The complaints of the gas company against the two ordinances were consolidated for hearing by the com
 
 *360
 
 mission, with the consent of the city and the gas company.
 

 Obviously, the first problem of the commission was to determine whether the rates fixed by'either or both of the ordinances were “unjust or unreasonable, or insufficient to yield reasonable compensation.” If it found that they were, then the commission would have the further problem of fixing just and reasonable rates for the periods covered by the ordinances.
 

 As to the first problem confronting the commission, when the record in this case is examined, it seems incredible that the city should continue to contend that the rates prescribed by either the 1944 or the 1946 ordinance were just or reasonable. See
 
 Ohio Utilities Co.
 
 v.
 
 Public Utilities Commission,
 
 267 U. S., 359, 69 L. Ed., 656, 45 S. Ct., 259.
 

 When effect is given to all the contentions of the city, $15,962,643 represents the lowest rate base the city claims for the purpose of testing the 1944 ordinance rates, and $17,321,571 the lowest for the purpose of testing the 1946 ordinance rates. The highest net operating revenues which the city claims were derived by the gas company were for 1944 $692,197.59 and for 1946 $848,144.61. These net operating revenues represent the yield which the city
 
 claims
 
 the gas company did receive from the 1941 ordinance rates. Those rates were actually collected by the gas company under bond until October 20, 1947, and were higher than those provided for in either the 1944 or 1946 ordinances. Also, this yield is much higher than it would have been if it had not reflected rejection by the city, as a cost of service, of substantial amounts which the commission approved and which the decision of this court approves.
 

 Thus, the highest net operating revenues, which the city claims were received by the gas company
 
 *361
 
 from rates higher than the 1944 or 1946 ordinance rates, produced only a 4.34% rate of return on the lowest rate base claimed by the city for the year 1944 and 4.9% on the lowest rate base so claimed for the year 1946.
 

 The findings of the commission with regard to this problem are summarized as follows in its final findings and opinion of May 25, 1948:
 

 “Applying
 
 the
 
 rates prescribed by
 
 the
 
 ordinances
 
 herein complained and appealed from to the sales for the years 1944 and 1946 and
 
 deducting
 
 therefrom the
 
 costs of service herein determined
 
 for the respective years and
 
 revising
 
 the company and
 
 city valuations as regards allowance for working capital
 
 there remains as a return to the company for the year 1944 the sum of $347,405.54, which amounts to a return of 2.04%
 
 on
 
 the
 
 value
 
 of the property herein
 
 found by
 
 the
 
 city as of
 
 June 30,
 
 1944,
 
 and a return of 1.44% on the value as of June 30, 1944, testified to by witnesses for the company.
 
 For
 
 the
 
 year-1946
 
 the rates prescribed by ordinance provide a return of $393,829.32 amounting to
 
 2.15% on
 
 the
 
 value
 
 of the property
 
 testified to by
 
 the
 
 city’s witness
 
 and a return of 1.44% on the value of the property testified to by witnesses for the company after deduction of the costs of service herein found for the year 1946.
 

 “It therefore appears that the rates prescribed by said ordinances herein complained of and appealed from are insufficient to provide to said appellant, The Cincinnati Gas & Electric Company, an adequate return on the value of the property dedicated to the furnishing of gas * * (Emphasis ours.)
 

 The commission was then confronted with the second problem of fixing just and'reasonable rates for the four-year period from June 30, 1944, to July 1, 1948. It did so by fixing and substituting for the ordinance
 
 *362
 
 rates separate rates for three portions of the period,, as follows:
 

 (1) The 1941 ordinance rates, which had been collected under bond, from June 30, 1944, to October 20,. 1947.
 

 (2) The emergency interim rates, fixed by its previous order
 
 (City of Cincinnati
 
 v.
 
 Public Utilities Commission,
 
 149 Ohio St., 570, 80 N. E. [2d], 150), from October 20, 1947 to May 25, 1948.
 

 (3) Slightly higher rates or charges, referred to as “rate A,” for the five weeks from May 25 to July 1, 1948.
 

 With regard to these three rates, the commission-, summarized its findings as follows:
 

 ‘ ‘ Schedule 5 made a part of this finding and opinion-shows that the rates and charges collected by the-company during the year 1944 provided to appellant, herein, The Cincinnati Oas & Electric Company, on. the sales of gas within the city of Cincinnati, Ohio,, after deduction of costs of service herein allowed, a. return of 2.844% on the city’s valuation after adjustments of working capital as above set forth and a return of 2.01% on the valuation submitted by the company with working capital allowance adjusted.
 

 “Schedule 6 made a part of this finding and opinion-shows that for the year 1946 the rates set forth in-‘proposed rate A’ would have provided to the company after deduction of the cost of service herein allowed for that year a return of 6.44% on the valuation submitted by the city adjusted for working capital as set forth herein and a’return of 4.3% on the valuation submitted by the company similarly adjusted as to allowance for working capital.
 

 “It appearing and the'commission hereby finding-that the rates and charges set forth in proposed rate A will not provide an unreasonable return on either-
 
 *363
 
 ■of the valuations submitted by the parties in this case, the rates and charges set forth in proposed rate A and herein found to be just and reasonable rates will be substituted from and after the effective date of this order for the rates and charges set forth in the •ordinances herein complained of and appealed from.”
 

 Since rate A was slightly higher than the emergency interim rates, if rate A would not provide the gas •company with an unreasonable return during the 1946 ordinance period, neither would the lower interim rates. We have previously referred to the rates of return of 4.34% for 1944 and 4.9% for 1946 from the 1941 ordinance rates, which would be indicat•ed if we assume that all the city’s contentions were ■correct as to the rate bases and costs of service for those years.
 

 The question, as to whether the rates so fixed by the commission for the four-year period were sufficient to. yield reasonable compensation to the gas company, was not before the commission, since the gas company had previously advised the commission that such rates were acceptable to it. We are of the opinion that the order of the commission was not unreasonable or unlawful to the extent that it determined that a rate •of return of 6.44% to the gas company was not unjust or unreasonable so far as customers of the gas company were concerned and did not provide the gas company with more than reasonable compensation.
 
 City of Marietta
 
 v.
 
 Public Utilities
 
 Commission, 148 Ohio St., 173, at 183 and 184, 74 N. E. (2d), 74;
 
 East Ohio Gas Co.
 
 v.
 
 Public Utilities Commission,
 
 133 Ohio St., 212, 12 N. E. (2d), 765.
 

 The city contends:
 

 1. The inventory of the company’s physical property as of June 30, 1944, did not comply with Section 499-9, General Code, and was improperly admitted into evidence.
 

 
 *364
 
 2. Failure of the commission to require an inventory of the company’s physical property as of the date certain, J une 30,1946, rendered any rate decision as to the 1946 ordinance manifestly against the weight of the evidence, illegal, invalid and void in every respect.
 

 In the proceeding before the commission, the gas company filed 32 volumes with hundreds of pages of inventory of its property claimed to be used and useful as of June 30, 1944. No dollar figurés were shown but in every other respect the inventory was complete. Dollar figures of the kinds and classes of property including land were furnished for the record by the company in a separate exhibit for June 30, 1944, and another for June 30, 1946. The city presented in the form of exhibits a valuation of the company’s property, used and useful in furnishing gas to the city, for each of the dates certain.
 

 The consolidation of the complaints was justified by certain reasons. Obviously, it would have been a useless and unnecessary expenditure of time and money to have required submission of two separate and complete rate cases. There was no need for two complete inventories. A 1946 inventory would have been largely a duplication of the 1944 one. It was necessary only to make adjustments of the 1944 inventory for additions and retirements in order to have the information which a separate 1946 inventory would have disclosed. The record shows that full information as to such additions and retirements was readily available from the company’s continuing property record. The city was apparently satisfied with the information available with regard to these additions and retirements since it presented through one of its exhibits as complete a reproduction study as of June 30, 1946, as it had in a similar calculation as of June 30, 1944.
 

 
 *365
 
 We believe that the foregoing contentions of the city are disposed of by what was said by Robinson, J., in
 
 Lindsey
 
 v.
 
 Public Utilities Commission,
 
 111 Ohio St., 6, 16
 
 et seq.,
 
 144 N. E., 729.
 

 The city contends that the commission failed to fix and determine the value of physical property of the gas company used and useful in the service of gas in corporate Cincinnati, as of the date certain, June 30, 1944, and as of the date certain, June 30, 1946.
 

 If the commission did err in this respect, which we do not decide, we fail to see how such error prejudiced the city. The record contains evidence as to the value of each kind and class of property. The commission pointed out that the city had submitted testimony as to the rate-base value of the gas company’s property as of both June 30, 1944, and June 30, 1946. Without exception the evidence as to value submitted by the city is the lowest. The commission found that rate A, the highest rates it approved, would have provided only a 6.44
 
 Jo
 
 return on the valuation submitted by the city after the valuation had been properly adjusted for a working-capital allowance. Any determination of value by the commission would have been equal to that or higher. A higher valuation would have necessarily indicated a lower rate of return.
 

 This court will not reverse an order of the commission as unreasonable or unlawful because of action of the commission, if such action did not prejudice the party seeking such reversal.
 

 The city complains about the evidence of valuation presented by the gas company, which disclosed a rate base of $24,282,868 as of June 30, 1944, and $27,719,-189 as of June 30, 1946. We do not believe that any useful purpose will be served in considering this complaint. The commission found that the highest rates that it fixed would provide the gas company a return
 
 *366
 
 of only 6.44% on the much lower valuation submitted by the city, and that such a rate of return was not unreasonable. If weight had been given to the gas company’s evidence of value, a lower rate of return would necessarily be indicated. Again, the city shows no prejudice to itself or the public as justification for its request that this court consider the matter complained of as a reason for reversing the commission’s order.
 

 The city contends that the gas company had the burden of proof before the commission.
 

 Since the law gives the city the power to fix rates by ordinance and the city did so fix such rates, the gas company did have the burden of establishing by a preponderance of the evidence that the rates so fixed were unjust or unreasonable.
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission,
 
 127 Ohio St., 109, 187 N. E., 7. However, even where a party having the burden of proof on a particular issue offers no evidence in support of that issue, a decision by the trier of the facts in such party’s favor on that issue will be sustained if supported-by substantial evidence offered by the other party. See
 
 Halkias
 
 v.
 
 Wilkoff Co.,
 
 141 Ohio St., 139, 146, 47 N. E. (2d), 199.
 

 In the instant case the law confers upon the commission the power to fix just and reasonable rates if the commission properly determines, as it did, that the rates fixed by ordinance were unjust or unreasonable. The product of its expert judgment in fixing such rates carries a presumption of validity. A party who seeks to upset rates so fixed by the commission has the ¡burden of showing that they are unjust or unreasonable.
 
 City of Marietta
 
 v.
 
 Public Utilities Commission, supra,
 
 at 186 and 187; 43 American Jurisprudence, 695, Section 186.
 

 The determination that a certain party has the burden of proof upon a particular issue is important in
 
 *367
 
 a case of this kind only where there is no substantial evidence to support the conclusion of the trier of the facts on that issue. Then such a conclusion will normally be sustained if adverse to the party having the burden of proof on that issue, and will be set aside if favorable to that party.
 

 In the instant case the decision of the commission on the issue upon which the gas company had the burden of proof is supported by substantial evidence offered by the city even disregarding the evidence offered by the gas company. That being so, the commission was authorized by law to fix rates for the ordinance periods. The burden was then on the city to show that the rates so fixed were unjust or unreasonable.
 

 Complaints have been made by the city about allowances by the commission, as part of the cost of service, of certain operating expenses of the gas company. Some of these complaints involve amounts which are relatively insignificant when an effort is made to determine their effect on the rate of return. Thus, taking the rate base for 1946 indicated by the city’s valuation evidence and used by the commission in finding that the highest rates fixed resulted in a rate of return of only 6.44%, it will be noted that disallowance of items of operating expenses totaling almost $11,000 would be required to increase the rate of return to 6.5%. A disallowance of $18,000 would be required to increase that rate of return by 1/10 of 1%.
 

 The city complains about the commission’s allowance, as a part of the cost of service, of charitable contributions of $4,245.83 and association dues of $1,826.08 for the year 1946.
 

 Also it is contended by the city, without showing-what the items of expense were or their amounts, that the operating expenses allowed included items of ex
 
 *368
 
 pense applicable to property not used or useful in supplying gas to Cincinnati consumers. It appears from tbe record that the gas company and the city had failed to eliminate some items of this kind from their evidence, but counsel for the city admitted that a very small amount of money was involved.
 

 Even if we were to decide that these charitable contributions, association dues and other small items should not have been allowed as a part of the cost of service in 1946, the city would not be enabled to sustain the burden which it has in this court of showing that the rates fixed by the commission were unjust or unreasonable.
 

 The city contends that the commission’s allocation of transmission expenses to ratepayers in Cincinnati was manifestly against the weight of the evidence.
 

 This record presents no questions as to what expenses should be classified as transmission expenses. All parties agree that the transmission expenses are those necessary to accomplish the transportation of gas from its point of production or purchase (i. e., delivery to the company), to the point where the gas enters the distribution system.
 

 The company, in presenting its case to the commission, took the position that the transmission expenses should be allocated to ratepayers in Cincinnati on the ratio that the amount of gas purchased by the company and delivered to Cincinnati bears to the total amount of gas purchased by the company. To put it hypothetically, but perhaps more clearly, the company’s theory is this: If the company purchases 1,000,000 m.c.f- of gas from all sources and delivers 500,000 m.c.f. of that purchased gas to consumers in Cincinnati, then the Cincinnati consumers should be allocated
 
 50%
 
 of the transmission expenses.
 

 The city took the position that transmission ex
 
 *369
 
 penses are necessary only in connection with gas which uses the transmission system and that gas which does not use the transmission system incurs no transmission expense. Therefore, the city based its allocation factor on the ratio that the gas delivered to Cincinnati through the transmission system bears to the gas using the transmission system.
 

 In support of its position the city states in its brief:
 

 “If rate payers in corporate Cincinnati purchased all the gas sold by The Cincinnati G-as & Electric Company, no question of allocation or methods of allocation would be presented. However, such is not the case. The company sells gas to a multitude of other communities and the
 
 same production, transmission and distribution facilities are used to supply all communities, including Cincinnati.”
 
 (Emphasis ours.)
 

 If the same production, transmission and distribution facilities are used to supply all the communities, Including Cincinnati, it would seem to follow that fairness would require allocation of transmission expenses on the ratio that the volume of gas delivered to Cincinnati bears to the total volume delivered by the gas company to all customers including those in Cincinnati. As pointed out by the commission the method proposed by the city “fails to give consideration to the fact that gas” which does not use the transmission system “is used in part for the furnishing of service outside the city of Cincinnati.”
 

 As the city argues, the method proposed by the company does not use the volume-delivered basis. However, if the gas company had purchased all its ga? Instead of manufacturing some, its method would have produced the same results as the volume-delivered basis. Thus, since the gas company’s method uses as factors the volume
 
 purchased and delivered
 
 to Cincinnati and the total volume
 
 purchased,
 
 such method
 
 *370
 
 would produce substantially the same results as the volume-delivered basis-.
 

 The fallacy of the city’s proposed method lies in the fact that it must rest on the arbitrary assumption that all gas purchased at a point where it enters directly into the gas company’s distribution system will be supplied to Cincinnati consumers. This would appear to be clearly inconsistent with the above-quoted statement from the city’s brief as well as the nature of the product involved.
 

 The arbitrary character of the results which would follow from the city’s method are further emphasized by the fact that, under it, the allocation to a particular community would not take into account how much of the transmission system was used by that community. For example, if, instead of having a very substantial amount of gas delivered directly into its distribution system, the gas company had all such gas delivered' into a 10-foot transmission line leading to its distribution system, then all the gas purchased by the gas company would use the transmission system and the results from the city’s method would be the same as those from the gas company’s method.
 

 We are of the opinion that the method of allocation proposed by the city is even more arbitrary than that condemned on appeal from this court in
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission,
 
 292 U. S., 398, at 408 and 409, 78 L. Ed., 1327, 54 S. Ct., 763, 91 A. L. R., 1403.
 

 It will be noted here that, in presenting its figures as to valuation of the gas company’s property as of June 30, 1944, and June 30, 1946, the city used the same method of allocation with respect to the transmission plant. This undoubtedly resulted in reducing the figures which the city claimed represented the-amount of the valuation of the gas company’s property on those dates.
 

 
 *371
 
 The city contends that there was error in allowing a charge of $20,315.51 to operating expenses in. 1946 as expenses for maintenance of customer’s appliances. However, there was evidence in the record supporting the conclusion that this sum related to “turning appliances off during the summer and on in the winter and * * * inspecting the appliances” and was “available to all customers.” The expense of such service would be allowable as a part of the gas company’s cost of furnishing its public-utility service.
 

 The city contends that the commission should have disallowed the $8,901.07 cost in 1946 of “stock registi-ar services, stock transfer agent and disbursing agent services, trustee service and expenses and the printing of reports to stockholders.” The city argues that payments for these items constituted payments by the gas company for the benefit of its shareholders and had nothing whatever to do with the furnishing of gas service to consumers in Cincinnati; and that such payments should be made out of the return to shareholders. This would necessarily reduce the amount available for distribution to those shareholders as compensation for use of the property in public service.
 

 The business of supplying gas to a city the size of Cincinnati must normally be conducted by a corporation. It is practically impossible to conceive of an individual or a partnership engaging in such a business because of'the amount of capital required and the risk that is inherent in the very nature of the business. A corporation naturally has certain expenses in connection with it. In the attraction of capita] to such an enterprise, expenses for stock registrars, transfer agents for stock, trustees’ fees in connection with mortgages, and reports to shareholders are unavoidably incurred.
 

 
 *372
 
 This being so, these expenses are necessarily incident to the supplying of gas to consumers and hence were properly allowed by the commission. See
 
 Ohio Utilities Co.
 
 v.
 
 Public Utilities
 
 Commission,
 
 supra.
 

 The city complains also about the annual allow'anee for depreciation approved by the commission.
 

 Both the law of Ohio (Sections 614-49 and 614-50,. General Code) and the principles of good business-require that the investment in a public utility be preserved so that, when it becomes necessary to retire-units of property, a fund will be available to reimburse the utility-for the cost thereof. Likewise, this-fund should provide for the partial loss in value of the units of property which have not been retired.
 
 East Ohio Gas Co.
 
 v.
 
 Public Utilities Commission, supra.
 
 This fund is called the depreciation reserve-fund and is built up and maintained through an annual charge to operating expenses.
 

 In the instant case, the city, the company and the commission are all in agreement that the sum to be eventually returned to the utility through the medium, of the depreciation fund is the original cost of the-property.
 

 The city’s estimate of this annual charge to operating expenses figures out at 1.25% of the original-cost of the property and results in an amount of' $179,980 for 1944 and $181,862 for 1946. The company’s estimate of this charge figures out at 2.2% of the original cost of the property and results in an. amount of $311,929 for 1944 and $309,900 for 1946.
 

 In its final findings and opinion, the commission adopted the estimate of the company.
 

 The city claims that the percentage of 1.25 is proper-on the basis of percentage calculations derived from observed-depreciation studies on set dates and for certain periods during the life span of the property..
 
 *373
 
 This basis gives no consideration to advancement of the art, obsolescence, lack of . utility or many other causes of depreciation that should be considered. For example, lack of utility of gas could be suddenly accelerated after many years of use and this fact should be considered in the determination of an annual allowance for depreciation. '
 

 There is no regularity in the actual occurrence of depreciation, and the amount of depreciation occurring in any one year (or period of years) is not the only measure by which this annual charge to expense should be determined. Depreciation caused by obsolescence, for example, depends on the development of the art. This development has never at any time been uniform or predictable. For a given piece of equipment there may be no substantial development in the art for 20 years. Overnight a new discovery may be made, making the equipment obsolete. Unusual property losses due to destruction and casualties are by their very nature irregular and unpredictable. Also maintenance, which is dictated partly by policy and partly by physical causes, may completely restore in any given year all the depreciation that has occurred in a particular piece of property. Thus, the basis used by the city in arriving at its annual allowance for depreciation does not cover all the essential elements of any depreciation study.
 
 East Ohio Gas Co.
 
 v.
 
 Public Utilities Commission, supra,
 
 at 224 and 225.
 

 The city’s composite percentage of annual depreciation in the amount of 1.25% would be based on an over-all life of the entire property of the company of 80 years. This is rather an absurd average life basis when we take into consideration that a great deal of the property involved is production equipment, meters, services, furniture and fixtures, all of which have a very much shorter average life span.
 

 
 *374
 
 Upon the basis found proper by the commission, the composite percentage of 2.2 for annual allowance for depreciation amounts to an average life span of 45.45 years for all the property of the company.
 

 In determining the annual allowance for depreciation, a decision must first be reached as to the proper annual percentage rate of depreciation for each class of property. Thereafter the determination of such allowance will be largely a matter of mathematical calculation. Thus, the rate estimate for a particular class of property will be used to calculate the actual dollar amount of depreciation for that class of property, and the sum total dollar amounts for all classes of property will represent the annual allowance for depreciation.
 

 A decision as to the proper annual percentage rate of depreciation for each class of property will necessarily be based on the testimony of qualified experts as to the probable length of the useful life of each such class of property. In figuring such probable length of such useful life various factors such as wear and tear, obsolescence and change in the art may be considered. Observed depreciation may be considered as a factor but it is not the only factor to be considered. The factors to be considered and the weight to be given each will necessarily vary with the class ox property involved.
 

 The aixnual allowance for depreciation is an operating expense. It should be treated in connection with operating expenses and revenues and not, as in the case of observed depreciation, in coxxnection with the property valuation involved in determining the rate base.
 
 City of Marietta
 
 v.
 
 Public Utilities Commission, supra.
 

 The company’s exhibits were prepared by its expert witness who had had wide experiexxce as a con-
 
 *375
 
 suiting engineer for utilities and had testified as such an expert before many courts and commissions.
 

 The commission’s staff made a study of much of the company’s property, including- the annual reserves for depreciation. The commission’s engineers and accountants testified, submitted exhibits and were subject to cross-examination by all parties.
 

 The conclusion of the commission as to the annual allowance for depreciation is in our opinion lawful and reasonable.
 

 The city contends that schedule 6 of the commission’s final findings and opinion is against the weight of the evidence because it contains operating-expense deductions unclaimed by the gas company and unknown to the record.
 

 In support of this contention, the city points out that in such schedule the commission sets forth a deduction of $406,658.66 for administrative and general expenses in 1946 which amount is $35,493.66 more than the gas company had claimed, after deducting from the amount claimed by the gas company a $1,000 item found by the commission to- be improper.
 

 In its brief, the commission points out that this $35,493.66 represents the allowance to the gas company for rate-case expense. It is also pointed out that the record discloses that the gas company had not claimed anything for such expense but did expect to do so when its amount could be determined.
 

 This court has held that such expense is properly allowable as a part of the cost of providing public utility service.
 
 Ohio Fuel Gas Co. v. Public Utilities Commission,
 
 139 Ohio St., 581, 584, 585, 41 N. E. (2d), 389.
 

 However, as the city contends, there is no evidence in the record in the instant case to show what amount should be allowed for such expense.
 

 
 *376
 
 Section 543, General Code, provides in part as follows:
 

 “No cause of action arising out of any order or decision of the commission shall accrue in any court to any corporation or person unless such corporation or person shall have made, before the effective date of said order or decision, application to the commission for a rehearing. Such application shall set forth specifically the ground or grounds on which the applicant considers said decision or order to be unreasonable or unlawful. No corporation or person shall in any court urge or rely on any ground not so set forth in said application.”
 

 Section 614-46a, General Code, reads:
 

 “In all contested cases heard by the commission, it shall be the duty of the commission to'file with the records thereof, written opinions setting forth the reasons prompting the decisions arrived at by the commission, together with a resume from the record of the facts upon which such decisions are based.”
 

 The city’s application to the commission for a rehearing did not “set forth specifically” that the deduction for administrative and general expense in schedule 6 of the findings and opinion exceeded the amount of such expenses claimed by the gas company. If it had and the commission had granted the application for rehearing, the gas company could have offered evidence for the record to support its claim for this rate-case expense item.
 

 Instead, the city has waited until the record is no longer before the commission and now makes the point for the first time. Such tactics have been recognized by the General Assembly to be unfair and in Section 543 it has specifically guarded against them. This court must disregard this belated argument on the part of the city and refuse to consider it. See
 
 *377
 

 Travis
 
 v.
 
 Public Utilities Commission,
 
 123 Ohio St., 355, 175 N. E., 586. Any other course would only encourage others to withhold claimed errors that could he corrected by the commission until the case had been filed in court and thus removed from the commission’s control. This would destroy the very purpose of an application for rehearing and make it an entirely meaningless procedural step.
 

 If the application for rehearing had “set forth specifically” this ground and the commission had denied that application, the contention now made by the city would clearly be entitled to consideration by this court. See
 
 Ohio Bell Telephone Co.
 
 v.
 
 Public Utilities Commission,
 
 301 U. S., 292, at 298, 81 L. Ed., 1093, 57 S. Ct., 724.
 

 We realize that, in its application for rehearing, the city did set forth as grounds on which the city considered the commission’s order to'be unreasonable or unlawful that (a) “the commission erred in that its opinion, finding’s and order of May 25, 1948, are not supported or sustained by the evidence, are manifestly against the weight of the evidence, are in clear and direct conflict therewith, are unreasonable and contrary to law,” and (b) “there are other errors apparent on the face of the record, prejudicial to the rights of the city of Cincinnati, to which it has duly excepted.”
 

 In our opinion, such general grounds do not “set forth specifically” this ground now relied upon by the city, as the General Assembly intended that it should be set forth in order to receive consideration from this court on appeal. Where a right to appeal is conferred by statute, the exercise of that right is conditioned upon compliance with the accompanying mandatory requirements.
 
 Zier
 
 v.
 
 Bureau of Unemployment Compensation,
 
 151 Ohio St., 123;
 
 Kinsman
 
 
 *378
 

 Square Drug Co.
 
 v.
 
 Evatt, Tax Commr.,
 
 145 Ohio St., 52, 60 N. E. (2d), 668. It may fairly be said that, by the language which it used, the General Assembly indicated clearly its intention to deny the right to raise a question on appeal where the appellant’s application for rehearing used a shotgun instead of a rifle to hit that question.
 

 The city contends that there is no evidence in the record to sustain the conclusions of the commission as to the gross-revenue yield from the rates which it fixed for the period from October 20, 1947 to May 25, 1948, and for the period from May 25 to June 30, 1948.
 

 A customer classification or bill analysis would probably be necessary to determine precisely what the gross revenues would be from rates such as these. This is because these rates vary with the quantities of gas used. There is no such customer classification or bill analysis in the record. There is also no other evidence in the record to show what gross revenues would be received from these rates.
 

 Plowever, here again, the city did not “set forth specifically” the absence of such evidence as a ground for its request to the commission for a rehearing. If it had and the commission had refused such request, this contention would be before this. court for consideration. Cf.
 
 Ohio Bell Telephone Co.
 
 v.
 
 Public Utilities Commission, supra,
 
 at 298 and 300. In our opinion, the general grounds hereinbefore referred to did not “set forth specifically” this ground, within the meaning of Section 543, General Code.
 

 The city complains of the fact that the commission did not find any specific rate of return correct.
 

 However, the commission did find that the highest rate, which it fixed for any portion of the four-year period involved, would provide the gas company a rate of return of only 6.44% on a rate-base valuation
 
 *379
 
 supported fully by evidence submitted by the city after the commission’s adjustment thereof for working capital. The commission further found that this would not provide an unreasonable return to the gas company.
 

 The commission found also that the comparable rate of return on the gas company’s valuation was only 4.3%. It would necessarily follow from approval of a 6.44% rate of return that 4.3% would not be unjust or unreasonable. The commission so found.
 

 The city asks “which percentage rate of feturn is correct.”
 

 That was not a problem before the commission since the gas company had agreed to accept the rates involved. Instead of having to determine whether the rates were not unreasonable, so far as they related to (1) the consumers and the public, represented by the city, and (2) the gas company, the commission then had to determine only that they were not unreasonable so far as the consumers and the public were concerned.
 

 The city, as a representative of consumers and the public and contending that the rate of return is too high, should, not be concerned as to whether that rate of return is too low and consequently unreasonable so far as the gas company is concerned. That is an academic problem in this case. It is the problem of the gas company, not the problem of the city.
 

 Since this court is of the opinion that the order of the commission is not unreasonable or unlawful (Section 544, General Code), it is affirmed.
 

 Order affirmed.
 

 Weygandt, C. J., Matthias, Hart and Zimmerman, JJ., concur.
 

 Stewart and Turner, JJ., not participating.