Taft, J.
On April 2,1957, the city of Mansfield adopted an ordinance providing for rates for electricity furnished by the Ohio Edison Company in that city. On May 28,1957, Ohio Edison, pursuant to Section 4909.34, Revised Code, filed with the Public Utilities Commission of Ohio its complaint or appeal with respect to that ordinance and the rates provided for therein.
By its order of May 26, 1961, the commission determined that the rates provided for in the ordinance were “insufficient to yield reasonable compensation for the services rendered,” determined what the. allowable gross annual revenue of Ohio Edison should be, and ordered it to file “adjusted tariff schedules establishing rates and charges” that would provide that revenue.
Being dissatisfied with that order, Ohio Edison appealed therefrom to this court. To facilitate consideration of the questions raised by the assignments of error, they will be discussed under headings suggested by the contentions in the brief of Ohio Edison.
RATE base depreciation.
Ohio Edison contends that the commission’s determination of the amount of depreciation to be deducted from the reproduction cost new of Ohio Edison’s property is unlawful and unreasonable.
What that amount was was a question of fact for determination by the commission. In making that determination, the commission must have relied upon the expert testimony of its chief engineer. From his testimony it is apparent that he *481 reached his conclusions by averaging results obtained by what was termed the “office method” with results obtained by what was termed the “field method.”
Ohio Edison argues that it is impossible by the use of the “office method” to state separately the “percentage and amount of each class of depreciation” as is required by Section 4909.05 (E), Revised Code. The fallacy of this argument is apparent from the holding of this court in Lindsey v. Public Utilities Commission (1924), 111 Ohio St., 6,144 N. E., 729, that the commission is not required by that statute to state separately the “percentage and amount of each class of depreciation” as long as it properly determines an amount for “depreciation from the new reproductive cost, as of” the “date certain.”
Ohio Edison argues further that use of the “office method” does not result in a determination of “actual,” “observed,” or “existing” depreciation.
This court has consistently held that the depreciation to be deducted for valuation purposes pursuant to Section 4909.05 (E), Revised Code, is “existing” depreciation, i. e., to use the statutory words, “depreciation * * * as of a date certain.” City of Cleveland v. Public Utilities Commission (1956), 164 Ohio St., 442, 448, 132 N. E. (2d), 216; City of Cincinnati v. Public Utilities Commission (1949), 151 Ohio St., 353, 372 et seq., 86 N. E. (2d), 10; City of Marietta v. Public Utilities Commission (1947), 148 Ohio St., 173, 74 N. E. (2d), 74; City of Cincinnati v. Public Utilities Commission (1925), 113 Ohio St., 259, 148 N. E., 817; Lima Telephone & Telegraph Co. v. Public Utilities Commission (1918), 98 Ohio St., 110, 119, 120 N. E., 330.
There are statements in some of our syllabi and opinions which suggest that “existing” depreciation is or may be the same as “actual” or “observed” depreciation. See for example City of Cincinnati v. Public Utilities Commission, supra (151 Ohio St., 353), 374; City of Cleveland v. Public Utilities Commission, supra (164 Ohio St., 442); City of Cincinnati v. Public Utilities Commission, supra (113 Ohio St., 259); City of Marietta v. Public Utilities Commission, supra (148 Ohio St., 173). On the basis of those statements, Ohio Edison argues in effect that “existing” depreciation cannot be based on anything other than observation. However, the words “actual” or “observed” in those opinions and syllabi were used to dif *482 ferentiate rate-base depreciation from a reserve for depreciation (i. e., book depreciation). The latter is the sum of past depreciation allowances as operating expenses and of course has no relevance in determining reconstruction cost new less depreciation.
The physical condition of used property, to the extent that it can be observed and compared with the physical condition of new property, is not the sole factor to be considered in determining the existing depreciation of such used property.
Section 4909.05, Revised Code, recognizes this when it mentions ‘ ‘ depreciation * * * for existing mechanical deterioration, for age, for obsolescence, for lack of utility, or for any other cause. ’ ’
Although this court might have reached a different conclusion from that of the commission on the question of fact as to the amount of existing depreciation, the majority of the court are of the opinion that the finding of the commission thereoii in the instant case is not against the weight of the evidence.
ALLOCATION OK PROPERTY AND EXPENSES.
Ohio Edison contends that “the commission erred in that it allocated both property and a portion of operating expenses on the basis of kilowatt hours consumed,” in determining the portion of the system-wide rate base and related expenses allocable to Mansfield.
The problem is that of allocating to Mansfield its proper portion of the “system-wide” rate base and related operating-expenses. Certain costs and assets are attributable to Mansfield in their entirety. Thus, the local Mansfield distribution plant is used to provide that city and no other area with electricity. However, Ohio Edison is an “integrated” company whose production and transmission facilities are so interconnected that it is impossible to tell at any given time where the electricity being used is coming from or how it got to where it is being used. Hence, transmission lines and production plants, which are a part of what may be referred to as the system-wide rate base, and the expenses connected therewith must be allocated among the various areas using Ohio Edison electricity. There is a further problem of allocating that portion of the system-wide rate base and related expenses attributable to *483 Mansfield among the various classes of Mansfield consumers. However, Ohio Edison makes no complaint here about the commission’s treatment of that allocation problem, and our only concern is with the commission’s allocation of system-wide rate base and related expenses to the geographical area of Mansfield.
The commission made this allocation by determining the total number of kilowatt hours consumed in Mansfield, dividing that number by the total number of kilowatt hours consumed system-wide, and applying the resulting fraction against the amount of system-wide rate base to be allocated and against the total expenses to be allocated.
This method does have the advantage of simplicity. However, Ohio Edison contends that such an allocation is arbitrary and unreasonable in that it completely fails to take into account the fact that, as stated in Ohio Edison’s brief, “groups of customers consuming equal amounts of kilowatt hours can be expected to, and do, impose widely varying demands upon the system.” Thus, one consumer city, which consumes no more kilowatt hours of power than another city, may consume much more power than such other city at one time and may therefore require more of the system-wide production and transmission capacity than does such other city. It is argued that one group of customers should not have to provide a fair rate of return upon an investment and meet expenses which that group’s requirements do not necessitate.
We do not intend to set forth or discuss the actual formula for allocation proposed by Ohio Edison because we never reach the question as to whether that formula would provide a proper allocation.
This question as to the proper method of allocation is a controversial problem. Compare Nash, Public Utility Rate Structures (1933), 229, McGraw Hill Book Co., Inc., New York; Barnes, Economics of Public Utility Regulation (1947), 325, 326, P. S. Crofts & Co., Inc., New York; Bauer, Transforming Public Utility Regulation (1950), 274, Harper & Bros., New York; Troxel, Economics of Public Utilities (1947), 575, J. J. Little & Ives Co., New York. No one formula is proper for all eases. See City of Cincinnati v. Public Utilities Commission (1950), 153 Ohio St., 56, 62, 90 N. E. (2d), 681.
The statutes nowhere specify a formula for allocation. *484 Hence, as long as the method chosen by the commission is not unreasonable, this court should not disturb it. Thus, the question is not whether the method proposed by Ohio Edison is the best method but whether the method of allocation used in this case by the commission is reasonable.
Rate making is not a subject capable of certainty. If it were, the Public Utilities Commission would be unnecessary, a machine could be programmed to do the necessary computations, and this court would not be faced with many of the vexatious problems before it today.
If the method used by the commission is applied uniformly to all geographic segments of Ohio Edison’s utility business, all of what has been referred to as its system-wide rate base and its system-wide expenses will be allocated to those geographic segments.
Ohio Edison does state in its brief that the commission has previously approved for other geographic segments of its public utility business the method of allocation for which Ohio Edison here contends. However, it does not appear that the commission imposed that method upon Ohio Edison. Certainly Ohio Edison cannot complain in this case because the commission approved that method in another ease if Ohio Edison asked the commission in that other case to approve that method.
To hold the method of allocation adopted here by the commission to be unreasonable would require our reconsidering paragraph 11 of the syllabus of City of Cincinnati v. Public Utilities Commission, supra (151 Ohio St., 353), and would require our overruling part of State, ex rel. Wilson, Dir. of Law, v. Hance, City Mgr. (1959), 169 Ohio St., 457, 159 N. E. (2d), 741. In the latter case, it was contended that peak loads of or demands for electric power placed on the capacity of a municipally owned public utility should be used in measuring the “total service or product supplied by” such electric utility under the limitation on sales thereof set forth in Section 6 of Article XVin of the Ohio Constitution. This court specifically rejected that contention. See also Columbus Gas & Fuel Co. v. Public Utilities Commission (1934), 292 U. S., 398, 78 L. Ed., 1327, 54 S. Ct., 763, reversing 127 Ohio St., 109, 187 N. E., 7. We have been referred by Ohio Edison to no ease holding that the method here used by the commission is unreasonable.
*485 We are not holding that the commission would have acted unreasonably had it adopted some other formula; or that, in all cases, the method here adopted by the commission will be reasonable ; or that, if we had been the commission, we would have chosen the same method. We merely hold that, in this case, the method of allocation adopted by the commission has not been shown to be unreasonable.
BATE OE RETTJBN.
Ohio Edison contends that "the 5.4 per cent rate of return allowed by the commission was less than a fair rate of return!
Under Section 4909.15, Eevised Code, a public utility is entitled to reasonable compensation for its rate base, i. e., the reproduction cost new less depreciation value of the property used and useful in providing the public utility services that it renders. A reasonable annual compensation for the amount of such rate base will be the dollar amount per year return therefrom that would be required to induce investors in the securities (such as bonds and shares of stock) of a company owning that property and so using it to provide for that company an amount of money equal to the amount of such rate base.
In the instant case, the rate base found by the commission is $9,221,579; and so the question is what amount per year of dollars would be required to induce investors in a company, owning that rate base and using it as Ohio Edison does, to provide that company with $9,221,579.
Before the advent of low interest rates on corporate bonds and high income tax rates, this presented a relatively simple question, even in an instance involving a rate base of as many dollars as that involved in the instant case. It could be resolved by considering expert testimony as to what earnings per year would be required to obtain from the market $9,221,579 for securities (then usually shares of common stock) of a company having the $9,221,579 worth of assets represented by the rate base and engaged in the business of providing with them the public utility services rendered by those assets.
It is probably for this reason.that most of our opinions have, as have most opinions outside this state, merely stated that the percentage allowed as a rate of return either was .or was not sufficient to provide a fair rate of return, and have given no *486 reasons for so deciding. 43 American Jurisprudence, 682, Section 169. See City of Cincinnati v. Public Utilities Commission, supra (153 Ohio St., 56). See also Village of Celina v. Public Utilities Commission (1927), 116 Ohio St., 596, 157 N. E., 72; East Ohio Gas Co. v. Public Utilities Commission (1938), 133 Ohio St., 212, 12 N. E. (2d), 765; East Ohio Gas Co. v. Public Utilities Commission (1940), 137 Ohio St., 225, 28 N. E. (2d), 599; City of Marietta v. Public Utilities Commission, supra (148 Ohio St., 173); City of Cincinnati v. Public Utilities Commission, supra (151 Ohio St., 353); City of Columbus v. Public Utilities Commission (1950), 154 Ohio St., 107, 93 N. E. (2d), 693; City of Columbus v. Public Utilities Commission (1952), 158 Ohio St., 101, 106 N. E. (2d), 775; Citizens Gas Users Assn. v. Public Utilities Commission (1956), 165 Ohio St., 536, 138 N. E. (2d), 383.
What the parties refer to as the “hypothetical company concept,” dealt with in City of Cleveland v. Public Utilities Commission (1956), 164 Ohio St., 442, 132 N. E. (2d), 216, and Ohio Fuel Gas Co. v. Public Utilities Commission (1960), 171 Ohio St., 10, 167 N. E. (2d), 496, is not the creation of this court but instead is the creation of those interested in lowering the percentage annual rate of return on the rate base to be paid for the use of assets of a public utility that are included in its rate base. Some of the reasons for its creation are given as follows in my opinion in City of Cleveland v. Public Utilities Commission, supra (164 Ohio St., 442), at pages 445, 446:
“It can probably be demonstrated that the earnings requirements of any public utility corporation, that can borrow money at less than 4 per cent interest [because of the tax advantage, even at a much higher rate], would be less if a substantial portion of its capital requirements were provided for partly by debt than its earnings requirements would be if its capital requirements were provided for only by stock, especially since the interest payable on debt, unlike dividends payable or earnings on stock, would be deductible under present tax laws in determining the income tax liability of such a corporation.” To the same effect see New England Telephone & Telegraph Co. v. Department of Public Utilities (1950), 327 Mass., 81, 89, 97 N. E. (2d), 509; New England Telephone & Telegraph Co. v. Department of Public Utilities (1954), 331 Mass., 604, 617, 121- *487 N. E. (2d), 896; Southern Bell Tel. & Tel. Co. v. Mississippi Public Service Commission (1959), 237 Miss., 157, 242, 113 So. (2d), 622; Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission (1957), 232 La., 446, 460, 94 So. (2d), 431; Southwestern Bell Telephone Co. v. State (1951), 204 Okla., 225, 228, 230 P. (2d), 260; Mountain States Telephone & Telegraph Co., Petition of (1955), 76 Idaho, 474, 486, 284 P. (2d), 681; San Antonio Transit Co. v. City of San Antonio (Tex. Civ. App., 1959), 323 S. W. (2d), 272, 274; New England Telephone & Telegraph Co. v. State (1953), 98 N. H., 211, 220, 97 A. (2d), 213; Chesapeake & Potomac Telephone Co. v. Public Service Commission (1952), 201 Md., 170, 189, 93 A. (2d), 249; State Corporation Commission v. Mountain States Tel. & Tel. Co. (1954), 58 N. M., 260, 277, 270 P. (2d), 685; New Jersey Bell Telephone Co. v. Dept. of Public Utilities (1953), 12 N. J., 568, 601, 97 A. (2d), 602. See also In re New York Telephone Co. (New York Public Service Commission, 1951), 91 P. U. R. (N. S.), 231, 258; In re Chesapeake & Potomac Telephone Co. (West Virginia Public Service Commission, 1951), 89 P. U. R. (N. S.), 250, 260; In re Southern Bell Telephone & Telegraph Co. (Alabama Public Service Commission, 1952), 96 P. U. R. (N. S.), 1, 21; In re Mountain States Telephone & Telegraph Co. (Wyoming Public Service Commission, 1953), 97 P. U. R. (N. S.), 114, 121; In re Northwestern Bell Telephone Co. (Nebraska State Railway Commission, 1952), 97 P. U. R. (N. S.), 394, 404; In re Southern Bell Telephone & Telegraph Co. (Tennessee Railroad and Public Utilities Commission, 1953), 100 P. U. R. (N. S.), 33, 39; Washington Public Service Commission v. Pacific Telephone & Telegraph Co. (Washington Public Service Commission, 1953), 100 P. U. R. (N. S.), 309, 327; In re Mountain State Telephone & Telegraph Co. (Colorado Public Utilities Commission, 1953), 1 P. U. R. (3d), 129, 140; In re Mountain States Telephone & Telegraph Co. (Utah Public Service Commission, 1953), 2 P. U. R. (3d), 75, 79; In re Michigan Bell Telephone Co. (Michigan Public Service Commission, 1954), 5 P. U. R. (3d), 301, 315, 325; Pennsylvania Public Utility Commission v. Peoples Natural Gas Co. (Pennsylvania Public Utility Commission, 1954), 6 P. U. R. (3d), 341, 358; In re Southwestern Bell Telephone Co. (Kansas State Corporation Commission, 1960), 34 P. U. R. (3d), 257, 305; In re Mountain *488 States Telephone & Telegraph Co. (Montana Public Service Commission, 1960), 31 P. U. R. (3d), 417, 443.
Because of the facts that (1) interest is a deductible item in figuring federal corporate income.tax liability (2) the federal income tax rate on corporations is 52 per cent and (3) interest rates have been low, it now costs much less per year to provide a given amount of capital if, instead of raising it all from the sale of stock, a substantial portion thereof is raised from the sale of bonds.
For example, suppose a public utility has a rate base of one million dollars. The evidence in the instant case as to the cost of capital from the sale of common stock indicates earnings requirements ranging from 7 per cent to 9.3 per cent. If only the earnings requirements of common stock are considered, at least a 7 per cent annual rate of return would be required on the rate base. This would amount to $70,000. However, if one half of the required one million dollars of capital should be raised by the sale of 6 per cent bonds, $30,000 (6 per cent of $500,000) would be required to pay interest on those bonds and only $35,000 a year (7 per cent of $500,000) would be required to pay dividends on stock. This would total only $65,000 and, because interest would be deductible in determining the 52 per cent federal income tax on the corporation, there would be a saving in income tax of $15,600 (52 per cent of $30,000) that would flow to and end up as earnings on the common stock. Thus the earnings requirements would be only $49,400 ($65,000 less $15,600). Hence, the cost of this one million dollars of capital, if one half were raised by the sale of 6 per cent bonds, would be only $49,400, thus requiring less than a 5 per cent instead of a 7 per cent rate of return on the rate base.
What will represent a reasonable annual compensation for the rate base will be the amount per year of income therefrom that would be required to induce investors to provide an amount equal to the rate base for the securities (such as bonds and shares of stock) of a corporation owning the rate base and engaged in the business of providing with the rate base the public utility services being rendered by the rate base.
The decision of the commission does not disclose how it reached its determination that the annual rate of return should be 5.4 per cent.
*489 Actually, the order of the commission allows less than a 5.4 per cent rate of return because it reduces the amount allowed as an expense for federal income tax by $21,972 on account of the amount by which so-called hypothetical interest allowed exceeded actual interest paid. Therefore, the dollar return allowed to Ohio Edison is not $497,965 as stated in the ultimate findings of the commission but only $475,993 ($497,965 less $21,972). This represents a return of about 5.16 per cent.
If we assume that, in making its determination as to the cost of capital, the commission used a capital structure of 45 per cent debt, 15 per cent preferred stock and 40 per cent common equity (as recommended by one of Ohio Edison’s witnesses) and allowed 4% per cent on debt and 5 per cent on preferred, the 5.16 per cent return will produce a yield of over 7 per cent on common equity. '
Ohio Edison’s evidence indicates 4% per cent as the proper current rate on debt and' less than 5 per cent on preferred at the date certain. There is evidence that 7 per cent would be a proper earnings percentage on common equity. Also, the market price of Ohio Edison’s stock so indicated.[1] Admittedly, the actual common stock equity of Ohio Edison represents only approximately 40 per cent of its capitalization.[2]
In its application for rehearing before the commission, Ohio *490 Edison did not assign as error the commission’s failure to set forth in detail how it determined the rate of return. See Section 4903.09, Revised Code; Section 4903.10, Revised Code; City of Cincinnati v. Public Utilities Commission, supra (151 Ohio St., 353), paragraph 17 of the syllabus; Commercial Motor Freight, Inc., v. Public Utilities Commission (1951), 156 Ohio St., 360, 102 N. E. (2d), 842.
If a result reached by the commission does not affirmatively appear to be unreasonable and if it does not affirmatively appear that the commission reached that result unlawfully or unreasonably and if the commission has not refused to set forth in its order its reasons in sufficient detail to enable a determination as to how it reached that result (cf. Commercial Motor Freight, Inc., v. Public Utilities Commission, supra [156 Ohio St., 360]), this court will not set that result aside. City of Marietta v. Public Utilities Commission, supra (148 Ohio St., 173), at page 187. See City of Cincinnati v. Public Utilities Commission, supra (153 Ohio St., 56).
INCOME TAX ADVANTAGE AND CLAIM EOR HYPOTHETICAL DEPRECIATION AS OPERATING EXPENSE.
Ohio Edison complains about the commission’s reduction of the amount allowed as an expense for federal income tax so that it is $21,972 less than the federal income tax actually paid by Ohio Edison. Ohio Edison contends further that, if that reduction was proper, then the commission should have increased the amount allowed as an expense for annual depreciation by applying Ohio Edison’s depreciation rates against the reproduction cost new less depreciation value of property included in the rate base instead of against the cost of such property (i. e., thereby allowing so-called “hypothetical depreciation”).
The commission should not have so reduced the amount allowed as an expense for federal income tax. City of Cincinnati. v. Public Utilities Commission, supra (153 Ohio St., 56), paragraph two of the syllabus. It probably did this because of a reasonable misinterpretation of the language used at page 13 in my opinion in Ohio Fuel Gas Co. v. Public Utilities Commission, supra (171 Ohio St., 10). However, the ultimate effect is the same as if the commission had, instead of requiring the deduction of $21,972 from federal income tax expense, considered that *491 amount as a tax advantage which would accrue to Ohio Edison by reason of the allowance as a part of a reasonable return on its rate base of an amount of interest in excess of that actually paid by Ohio Edison. In any event, the ultimate conclusion reached by the commission as a result of the elimination of this $21,972. from Ohio Edison’s expenses (which probably should have been accomplished by recognizing it merely as a tax advantage in determining the cost of raising capital) is fully sustained by what we decided and what was said in Ohio Fuel Gas Co. v. Public Utilities Commission, supra (171 Ohio St., 10), 13.
So-called hypothetical interest and earnings requirements are considered only in an endeavor to determine a reasonable rate of return on the amount of the rate base. Since the dollar amount of the rate base of a public utility may be higher or lower than the total dollar amount of its borrowed and equity capital, it is obvious that the interest and earnings requirements on the amount of its rate base probably will not coincide with the actual interest paid or the earnings requirements on the actual amount of the equity capital (i. e., stock capital) of the public utility.
However, in our opinion, usual accounting principles should be followed in determining what is available for income taxes, interest, and earnings on equity capital. From the viewpoint of accounting, the cost of an asset is a prepaid operating expense to be apportioned among the years of its life by some more or, less systematic procedure. It is cost, not value, that is to be so apportioned. Thus, part of that cost and not part of any higher or lower value is to be apportioned as an operating expense during each year. See Grant and Norton, Depreciation (1949), 12; City of Cincinnati v. Public Utilities Commission, supra (151 Ohio St., 353), 372. If that is done, there is no occasion for any adjustment of depreciation such as is contended for by Ohio Edison. The depreciation considered in determining income is an item of expense and should be 'figured on cost and not on value (whether value for rate making purposes is determined on a reproduction cost new less depreciation basis or otherwise).
It is undoubtedly true that, where costs have risen, the depreciation charged as an operating expense will not provide enough to replace an asset when it is used up. Theoretically, such depreciation should at that time have provided an amount *492 equal to the cost of the used-up asset. However, where the reproduction cost of that asset has risen, such depreciation will not have provided an amount sufficient to replace the used-up asset. But see City of Columbus v. Public Utilities Commission, supra (154 Ohio St., 107), and City of Cleveland v. Public Utilities Commission, supra (164 Ohio St., 442), where the depreciation reserves based on cost of property .apparently exceeded “existing” depreciation based on reproduction cost new of such property. Thus, where the reproduction cost new less depreciation value of an asset is higher than its. book depreciated cost, some amount for annual depreciation probably should be allowed in addition to the amount of annual depreciation allowed as an expense. It is probably for this reason that Section 4909.39, Revised Code, provides for “making reservations from the income for surplus, depreciation, and contingencies.”
In the instant case, it appears that dividend requirements on Ohio Edison common stock were only 5 per cent, but at least 7 per cent was allowed on common equity. The record does not affirmatively show that the additional allowance over 5 per cent would not be sufficient to include sufficient provision for any amount that should be allowed for depreciation in addition to the amount of depreciation allowed as an expense.
AMORTIZATION OK “PLANT ACQUISITION ADJUSTMENTS ACCOUNT.”
The costs to Ohio Edison of the assets of the companies consolidated in 1930 to form Ohio Edison exceeded the then depreciated costs of those assets to those companies by some 14 million dollars.
Apparently, Ohio Edison entered the depreciated costs of those assets on its books at that time, and, to reflect that 14 million-dollar additional amount paid for those assets by Ohio Edison in 1930, Ohio Edison established on its books what is referred to as a “plant acquisition ‘adjustments account.” Apparently, in 1946, Ohio Edison, pursuant to orders made by the commission, began to amortize this “plant acquisition adjustments account” over a 15-year period by charging $966,720 per year as an operating revenue deduction.
Ohio Edison contends that $14,900 of that $966,720 is allocable to the expenses which should be allowed in determining the cost of rendering the public utility services for which *493 rates are being fixed in this proceeding. The commission apparently disagreed with this contention.
Ohio Edison states that, “since the sole purpose of the annual provision to amortize plant acquisition adjustments is simply to amortize legitimate cost of property incurred by the company at arms length * * *, it is directly analogous to the annual provision for depreciation, the purpose of which is like- ' wise to amortize cost of property” (such cost thus being in effect treated as a prepaid expense). If something should be deducted as an expense in each year for these additional costs, then it is obvious that such deductions should have begun in 1930. If they had and if 15 years is a proper period for completing the amortization of these additional costs, then it is equally obvious that rate payers should not be charged for their amortization after 1945. See Knoxville v. Knoxville Water Co. (1909), 212 U. S., 1, 14, 53 L. Ed., 371.
It is possible that some portion of the 14 million-dollar additional amount paid for those assets in 1930 could reasonably be considered as a chargeable expense in 1956 under a reasonably systematic procedure for apportioning the cost of an asset among the years of its life. However, none of the evidence in the record to which reference has been made so indicates. As we view it, Ohio Edison has failed to sustain the burden of establishing what if any amount of these additional costs in 1930 could reasonably be charged against operating expenses in 1956. See City of Cincinnati v. Public Utilities Commission, supra (151 Ohio St., 353), paragraph nine of the syllabus.
CONTENTION THAT ALLOWANCE EOR FEDERAL INCOME TAX EXPENSE SHOULD BE COMPUTED AS IF STRAIGHT-LINE INSTEAD OF ACCELERATED DEPRECIATION HAD BEEN USED.
This contention must be rejected because of our decision in Cincinnati Gas & Electric Co. v. Public Utilities Commission (1962), 173 Ohio St., 473. The writer of this opinion would like to add briefly to the reasons set forth in the opinion by the court in support of that decision.
By claiming accelerated depreciation instead of “straight-line depreciation” in determining its federal income tax liability, Ohio Edison is now enabled to claim more for depreciation and thereby to reduce its federal income tax liability. However, *494 the result may be that Ohio Edison will have to pay higher income taxes sometime in the future than it would have had to pay if it had claimed only “straight-line depreciation” in determining its federal income tax liability.
•Ohio Edison argues that it is therefore in effect deferring to the future part of its present federal income tax liability; and that, unless something is collected from present rate payers to provide for payment of the income tax liability so deferred, future rate payers will thus have been required to confer a benefit upon present rate payers.
This argument must rest upon the premise that Ohio Edison’s present federal income tax liability is not what Ohio Edison is required to pay but some greater amount that it is not required to pay on account of that liability. The statement of that premise should be sufficient to demonstrate that it is unsound.
It could just as reasonably have been argued after July 1, 1961, that, since the income tax law provided for a corporate income tax rate of 52 per cent for years beginning before July 1, 1962, and only a 47 per cent rate for subsequent years (Section 11, Title 26, U. S. Code, as amended June 30, 1961), payments at the 52 per cent rate for the 1961 tax year would represent in part a prepayment of tax liabilities for future years.
The 52 per cent rate on corporations may be lowered or raised, and depreciation provisions may be further liberalized or vice versa. Many changes may be made in the federal income tax laws which cannot now be reasonably anticipated but which will have an effect upon the amount of Ohio Edison’s income tax liability in future years.
RATE CASE EXPENSE.
Ohio Edison contends that the rate case expense of this proceeding totaled $322,600. The record discloses admissions by Ohio Edison to the effect that some of the costs that it claims resulted in data used not only in these rate proceedings but in rate negotiations involving parts of Ohio Edison’s business not involved in these proceedings. The record is very vague as to what amount of data was so used and contains nothing definite to suggest how any such amount should be allocated. The record discloses also that a very substantial part of the amount claimed *495 represented straight-time payroll costs of Ohio Edison personnel. In our opinion, the finding of the commission, that only $217,398 of the $322,600 should be allowed, is neither unreasonable nor against the weight of the evidence.
AMORTIZATION 0E RATE CASE EXPENSE.
Ohio Edison still complains because the commission decided that this expense should be amortized over a 5-year period instead of a 2-year period.
Under the terms of the Mansfield rate ordinance from which Ohio Edison appealed, the ordinance rates were to become effective May 2, 1957. Since that date, Ohio Edison has been collecting under bond the higher rates in effect prior to the passage of that ordinance. Those rates also exceed the rates requested by Ohio Edison as well as the rates approved by the commission in the instant case. Under its bond, Ohio Edison will be obligated to refund to its customers any excess in the amount so collected under bond over the amount that would have been collected under the rates ultimately allowed in the instant proceedings. Thus, if the order of the commission appealed from is affirmed, the amounts that Ohio Edison will retain will have enabled it to fully realize by May 2, 1962, as an allowed expense the total $217,398 rate case expense allowed by the commission. On that date, the 5-year period expired. Thereafter, Ohio Edison will theoretically at least continue to receive from the rates allowed by the commission 1/5 of $217,398 or $43,480 per year or over $110 per day as an allowable expense on account of the theretofore fully amortized $217,398 rate ease expense allowed by the commission.
COSTS 0E ORGANIZATION.
Ohio Edison complains about the refusal of the commission to include anything in the rate base for costs of organizing.
Ohio Edison’s valuation witness testified that $2,750,000 was an overall estimate of what he considered the cost would have been to organize as of the date certain a company the size of Ohio Edison. However, the record discloses that the witness was unable to give any reasonable explanation for that estimate.
The commission stated that the ‘ ‘ estimate of $2,750,000 for organization remains unsubstantiated on the record and must be eliminated from the rate base.”
*496 It is for the trier of the facts to determine the weight to be given opinion evidence on value, and the inability of an expert witness to give reasons for his opinion, when called upon to do so, may so affect the weight to be given his testimony that, even in the absence of evidence conflicting therewith, the trier of the facts may not be required to give any weight thereto. See 20 American Jurisprudence, 1056, 1059, 1060, 1061, Sections 1206 and 1208; 7 Wigmore on Evidence, 260, Section 2034. See also Dayton Power & Light Co. v. Public Utilities Commission (1934), 292 U. S., 290, 78 L. Ed., 1267, 54 S. Ct., 647.
However, it is obvious that the cost of organizing a company of this size would be very substantial. The commission probably should have found the amount of such cost to be at least equal to or in excess of the $89,746 which the evidence discloses as now appearing on Ohio Edison’s books as having been the cost of organizing Ohio Edison in 1930. Because only a relatively small portion of that amount would be applicable to the rate base to be used in determining rates in Mansfield, the overall effect of this error of the commission would only result in the rates ordered by the commission for Mansfield being somewhat under $150 less in a year than they should have been.
It is obvious that Ohio Edison will lose far less from that error than Ohio Edison will realize after May 2, 1962, under the rates approved by the commission, which will thereafter continue to provide Ohio Edison with substantial amounts each year on account of the fully amortized rate case expense approved by the commission.
Although unlawful or unreasonable, an order of the Public Utilities Commission will not be reversed where its effect, to the extent that it is unlawful or unreasonable, will not be such as to prejudice someone who appeals from that order. City of Cincinnati v. Public Utilities Commission, supra (151 Ohio St., 353), paragraph six of the syllabus.

Order affirmed.

■ Zimmerman, Matthias, Bell and Griffith, JJ., concur.
Weygandt, C. J., concurs in the judgment.
Griffith, J., of the Seventh Appellate District, sitting by designation in the place and stead of Herbert, J.

If we take judicial notice of the prices of Ohio Edison shares as reported on the New York Stock Exchange and of the earnings per share on those shares in recent years, it appears that the earnings yield on the mean price for the test year 1956 was 7.1 per cent, for 1957 it was 7.7 per cent, for 1958 it was 6.5 per cent, and for 1959 and 1960 it was only 6.4 per cent.

It may be questionable whether, in determining the cost of raising am amount of capital equal to the rate base, rate payers should be burdened with the greater cost of raising capital involved in using preferred stock instead of interest bearing obligations. Burdening rate payers with that greater cost might be reasonably justified upon the basis that Ohio Edison cannot avoid having part of its capital represented by the amount of preferred stock actually outstanding. However, this leads, in considering the cost of raising an amount of capital equal to the rate base, to considering not current but the lower actual dividend requirements on the amount of such preferred stock as well as the lower actual interest on that portion- of such capital to be provided for by debt that is equal to the amount of the debt actually outstanding. We express no opinion with regard to these problems,