CITY OF CLEVELAND; TOLEDO COALITION FOR SAFE ENERGY
ET AL., APPELLANTS, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

(No. 80-233—Decided December 23, 1980.)

210

*Mr. Terry J. Lodge,* for appellants.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Mr. David M. Neubauer,* for appellee.

*Messrs. Fuller, Henry, Hodge & Snyder, Mr. Paul M. Smart* and *Mr. Fred J. Lange, Jr.,* for intervening appellee Toledo Edison Co.

*Messrs. Squire, Sanders & Dempsey, Mr. Alan P. Buchmann, Mr. Kevin T. Duffy, Mr. Alan D. Wright* and *Mr. Craig I. Smith,* for intervening appellee Cleveland Electric Illuminating Co.

*Per Curiam.* The first issue for this court's determination is whether the commission is preempted from ordering a shutdown of a nuclear generating plant by the Atomic Energy Act of 1954, as amended, Sections 2011 *et seq.,* Title 42 of the U. S. Code.

Section 2011, Title 42, U. S. Code, states:

"Atomic energy is capable of application for peaceful as well as military purposes. It is therefore declared to be the policy of the United States that—

"(a) the development, use, and control of atomic energy shall be directed so as to make the maximum contribution to the general welfare, subject at all times to the paramount objective of making the maximum contribution to the common defense and security; and

"(b) the development, use, and control of atomic energy shall be directed so as to promote world peace, improve the general welfare, increase the standard of living, and strengthen free competition in private enterprise."

Section 2021, Title 42, U. S. Code, states, in part:

"(a) It is the purpose of this section—

"(1) to recognize the interests of the States in the peaceful uses of atomic energy, and to clarify the respective responsibilities under this chapter of the States and the Commission with respect to the regulation of byproduct, source, and special nuclear materials;

"(2) to recognize the need, and establish programs for, cooperation between the States and the Commission with respect to control of radiation hazards associated with use of such materials;

"(3) to promote an orderly regulatory pattern between the Commission and State governments with respect to nuclear development and use and regulation of byproduct, source, and special nuclear materials;

"(4) to establish procedures and criteria for discontinuance of certain of the Commission's regulatory responsibilities with respect to byproduct, source, and special nuclear materials, and the assumption thereof by the States;

"(5) to provide for coordination of the development of radiation standards for the guidance of Federal agencies and cooperation with the States; and

"(6) to recognize that, as the States improve their capabilities to regulate effectively such materials, additional legislation may be desirable.

"(b) Except as provided in subsection (c) of this section, the Commission is authorized to enter into agreements with the Governor of any State providing for discontinuance of the regulatory authority of the Commission under subchapters V, VI, and VII of this chapter, and section 2201 of this title, with

respect to any one or more of the following materials within the State—

"(1) byproduct materials as defined in section 2014(e)(1) of this title;

"(2) byproduct materials as defined in section 2014(e)(2) of this title;

"(3) source materials;

"(4) special nuclear materials in quantities not sufficient to form a critical mass.

"During the duration of such an agreement it is recognized that the State shall have authority to regulate the materials covered by the agreement for the protection of the public health and safety from radiation hazards.

"(c) No agreement entered into pursuant to subsection (b) of this section shall provide for discontinuance of any authority and the Commission shall retain authority and responsibility with respect to regulation of—

"(1) the construction and operation of any production or utilitization facility;

"* * *

"(k) Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards."

The doctrine of preemption is premised on Clause 2 of Article VI of the United States Constitution. The doctrine forbids state regulation of an area if there is explicit or implicit exclusion of state regulation by Congress over a particular subject matter. See, *e.g., Florida Lime & Avocado Growers, Inc.,* v. *Paul* (1963), 373 U. S. 132; *Campbell* v. *Hussey* (1961), 368 U. S. 297; *Bethlehem Steel Co.* v. *New York Labor Relations Bd.* (1947), 330 U. S. 767. There has been no explicit preemption by Congress in this case. It must, therefore, be determined whether the commission erred in its finding that state regulation of the radiological aspects of nuclear power generation has been implicitly preempted by congressional legislation.

The landmark case in this area is *Northern States Power Co.* v. *Minnesota* (C.A. 8, 1971), 447 F. 2d 1143, affirmed 405 U. S. 1035. In *Northern States,* the court held that the federal

government had preempted state regulation of the operational safety of nuclear power plants.

The court, in *Northern States,* utilized a number of factors in determining that Congress had implicitly preempted the area. These factors include: the intent of Congress as revealed by statute and legislative history; the pervasiveness of the federal regulatory scheme as authorized by legislation and as carried into effect by an administrative agency; the nature of the subject matter as demanding or not demanding exclusive federal regulation to achieve uniformity vital to national interests; and state law being or not being an obstacle to the accomplishment of Congressional objectives. We recognize the appropriateness of the analysis and of the result reached.[1]

The legislative history reveals a pattern of strong federal regulation of nuclear energy.

As outlined in *Northern States,* Congress has traditionally imposed strong federal control over the use of nuclear energy. In 1946, Congress enacted the first legislation regarding nuclear power, creating a governmental monopoly over all nuclear production materials. In 1954, after technical and scientific advances in development, Congress allowed private enterprise to develop and utilize atomic energy for peaceful purposes subject to federal licensing and regulation. Finally, in 1959, Section 2021, Title 42, U. S. Code, was enacted to clarify the position of the states in the regulation of nuclear power.

In addition to the historical pattern of strong federal regulation, Section 2021 itself indicates a congressional intent to severely limit state regulation. The powers given states in Section 2021(b) are enumerated with a great deal of specificity and can only be exercised if an agreement is reached between the state and the federal government.

On the other hand, Section 2021(c)(1) broadly states that

---

[1] Recently, in *Stebbins* v. *Pub. Util. Comm.* (1980), 62 Ohio St. 2d 431, we stated, in fn. 2, at page 434, as follows:

"It should be noted that Congress through the Atomic Energy Act of 1954, as amended***and the Energy Reorganization Act of 1974***has preempted state legislation in this area.***"

Therefore, the decision in the instant cause is essentially a reiteration of the footnote in *Stebbins* and, hopefully, will put to rest the question whether Congress has implicitly preempted the area in question.

no agreement under subsection (b) shall affect the continuing authority of the federal government with respect to the regulation of the construction and *operation* of any production or utilization facility. In addition, subsection (k) states that nothing in Section 2021 should be construed to forbid states from regulating activities for purposes other than protection against radiation hazards. By implication, Section 2021 greatly affects state authority to regulate activities in order to protect against radiation hazards.

Finally, the nature of the subject matter and potential obstacles which would be presented if there were not a uniform body of law indicates a need for exclusive federal control. As stated in *Northern States,* at pages 1153-1154:

"* * *[R]egulation of the radioactive effluents discharged from a nuclear power plant is inextricably intertwined with the planning, construction and entire operation of the facility.* * *[M]ajor generating plants not only produce electric power for customers in their own and neighboring states, but are part of an interstate transmission system which makes possible the purchase and sale of electric power between major systems across the nation. Congressional objectives expressed in the 1954 [Atomic Energy] Act evince a legislative design to foster and encourage the development, use and control of atomic energy so as to make the maximum contribution to the general welfare and to increase the standard of living. 42 U.S.C. §§2011, 2012. However, these objectives were to be effectuated 'to the maximum extent consistent with the common defense and security and with the health and safety of the public.' 42 U.S.C. §2013. Thus, through direction of the licensing scheme for nuclear reactors, Congress vested the AEC [Atomic Energy Commission] with the authority to resolve the proper balance between desired industrial progress and adequate health and safety standards. Only through the application and enforcement of uniform standards promulgated by a national agency will these dual objectives be assured. Were the states allowed to impose stricter standards on the level of radioactive waste releases discharged from nuclear power plants, they might conceivably be so overprotective in the area of health and safety as to unnecessarily stultify the industrial

development and use of atomic energy for the production of electric power."

Since *Northern States,* Congress has enacted two statutes which are relevant to the issue of federal preemption. In the Energy Reorganization Act of 1974, Sections 5801 *et seq.,* Title 42, U. S. Code, the dual duties of research and development and of safety regulation, which had been the Atomic Energy Commission's duties, were divided between the Energy Research and Development Administration and the Nuclear Regulatory Commission. In the Clean Air Act Amendments of 1977, Congress gave authority over radioactive emissions to the Environmental Protection Agency and the states. Sections 7422 *et seq.,* Title 42, U. S. Code.

In reorganizing the regulation of nuclear energy, Congress did not indicate an intent to grant the states any additional power—it only indicated an intent to separate the potentially conflicting duties which had been assigned to the Atomic Energy Commission.

In the Clean Air Act Amendments, Congress was very specific in its grant of power to the Environmental Protection Agency and to the states; the powers granted in the Act only apply to emissions. As a consequence, Congress demonstrated no intent to allow the states to regulate operations of nuclear power plants except in terms of emissions.

In addition, Congress left Sections 2021(c)(1) and 2021(k) intact, indicating an intent to continue to preempt most regulation of nuclear power plants.

We hold that the federal government has preempted state regulation of the operation of nuclear power plants with respect to radiological hazards and safety considerations, except for those hazards relating to radioactive emissions,[2] and those narrowly defined exceptions enumerated in Section 2021(b).

The second issue herein involves an interpretation of R. C.

---

[2] We note that the specific holding in *Northern States* involved radioactive emissions and has been overruled by the Clean Air Act Amendments of 1977. However, the analysis of *Northern States* and its ultimate assessment, that the federal government has preempted state regulation of all but a few narrowly defined areas of nuclear power safety, is as compelling today as it was in 1971. The Clean Air Act Amendments of 1977 have only defined another narrow area where state regulation is permissible.

4905.26.[3] Appellants assert, in their second proposition of law as follows:

"***Where a complaint alleges substantive facts concerning the managerial and operational inadequacies of a nuclear generating facility, its economically infeasible performance, its excessively burdensome operability and costs, its inappropriate inclusion in its owners' rate bases as 'used and useful,' and the excessive purchased power costs occasioned by its frequent inoperability, the [sic] 'reasonable grounds' are deemed to exist within the meaning of Section 4905.26 to warrant a hearing."

The commission dismissed this issue on the basis of our decision in *Consumers' Counsel* v. *Pub. Util. Comm.* (1979), 58 Ohio St. 2d 449, wherein it was decided that Davis-Besse was not "used and useful" for the applicable time period presented in that case. The commission also stated that "***Toledo Edison has a rate proceeding pending before the Commission, case No. 79-143-EL-AIR. That case will provide an additional opportunity for consideration of the used and usefulness of Davis-Besse for the twelve month period ending September 30, 1979."

This court held in *Consumers' Counsel, supra,* that Davis-Besse was not used and useful, and no order to the contrary has since been issued by the commission. R. C. 4905.26 allows utility practices to be challenged in the state of Ohio, but such a challenge can not be based on the assertion that at some time

---

[3] R. C. 4905.26 provides, in relevant part:

"Upon complaint in writing against any public utility by any person, firm, or corporation, or upon the initiative or complaint of the public utilities commission, that any rate, fare, charge, toll, rental, schedule, classification, or service, or any joint rate, fare, charge, toll, rental, schedule, classification, or service rendered, charged, demanded, exacted, or proposed to be rendered, charged, demanded or exacted, is in any respect unjust, unreasonable, unjustly discriminatory, unjustly preferential, or in violation of law, or that any regulation, measurement, or practice affecting or relating to any service furnished by said public utility, or in connection with such service, is or will be, in any respect unreasonable, unjust, insufficient, unjustly discriminatory, or unjustly preferential, or that any service is, or will be, inadequate or cannot be obtained, and, upon complaint of a public utility as to any matter affecting its own product or service, if it appears that reasonable grounds for complaint are stated, the commission shall fix a time for hearing and shall notify complainants and the public utility thereof, and shall publish notice thereof in a newspaper of general circulation in each county in which complaint has arisen."

in the future a dispute will occur. At this time there is no dispute and, therefore, the commission properly denied appellant's request for a hearing.

Lastly, appellants contend that "[a] period of ninety (90) days from the date of filing of complainants' reply memorandum to the final dismissal of the complaint by the Public Utilities Commission is an unreasonably long period of inaction by the commission within the meaning of Section 4905.26." Although such a period of delay may be inappropriate in some situations, appellants have not demonstrated that they were prejudiced by the commission's period of inaction in this cause. *Akron* v. *Pub. Util. Comm.* (1978), 55 Ohio St. 2d 155, 161; *Cincinnati* v. *Pub. Util. Comm.* (1949), 151 Ohio St. 353, paragraph six of the syllabus.

For the foregoing reasons, the order of the commission is affirmed.

*Order affirmed.*

CELEBREZZE, C. J., W. BROWN, P. BROWN, SWEENEY, LOCHER, HOLMES and DOWD, JJ., concur.