OHIO EDISON COMPANY, APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Ohio Edison Co. v. Pub. Util.
Comm.* (1992), 63 Ohio St.3d 555.]

(No. 90–2406—Submitted October 22, 1991—Decided May 6, 1992.)

*Michael R. Beiting, Leila L. Vespoli* and *Kathy J. Kolich; Porter, Wright,
Morris & Arthur* and *Samuel H. Porter,* for appellant.

*Lee I. Fisher,* Attorney General, *James B. Gainer, Duane W. Luckey,
Thomas W. McNamee* and *William L. Wright,* for appellee.

*Bell, Royer & Sanders Co., L.P.A., Langdon D. Bell, Barth E. Royer* and
*Judith B. Sanders,* for intervening appellee, The Industrial Energy Consumers.

*William A. Spratley,* Consumers' Counsel, *James A. Pepper* and *Maureen
R. Grady,* for *amicus curiae,* Office of Consumers' Counsel.

*Per Curiam.* Appeals arising from orders of the Public Utilities Commission are subject to the standard of review contained in R.C. 4903.13, which provides in part:

"A final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable."

In *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1988), 38 Ohio St.3d 266, 268, 527 N.E.2d 777, 780, we repeated our interpretation of this standard, stating:

·"Under the 'unlawful or unreasonable' standard specified in R.C. 4903.13, this court will not reverse or modify a PUCO decision as to questions of fact where the record contains sufficient probative evidence to show the PUCO's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Dayton Power & Light Co. v. Pub. Util. Comm.* (1983), 4 Ohio St.3d 91, 4 OBR 341, 447 N.E.2d 733; *Columbus v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 103, 12 O.O.3d 112, 388 N.E.2d 1237. * * *"

We have further recognized that this court has complete and independent power of review as to questions of law, and that legal issues are to be given more intense examination than factual questions. *Consumers' Counsel v. Pub. Util. Comm.* (1983), 4 Ohio St.3d 111, 4 OBR 358, 447 N.E.2d 749; *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 12 O.O.3d 115, 388 N.E.2d 1370. We consider the six errors alleged by Ohio Edison with these standards in mind.

I

As its first proposition of law, Ohio Edison claims that the commission erred in its allocation of deferred costs associated with the Beaver Valley 2 nuclear generating unit. This allocation was necessary to separate costs incurred with respect to retail sales of electricity, which are recoverable from ratepay-·ers in this proceeding ("jurisdictional sales"), from costs incurred with respect to wholesale sales, which are subject to regulation by the Federal Energy Regulatory Commission ("nonjurisdiction sales"). To make this allocation, the level of nonjurisdictional sales to American Municipal Power–Ohio, Inc. ("AMP–Ohio") had to be ascertained.

In its application, Ohio Edison quantified the level of AMP–Ohio sales at one hundred twenty-five megawatts ("MW"), using six months' actual and six months' estimated test-year data. This was the same methodology that the

company used in developing the numerous other allocation factors in this proceeding. During its rebuttal testimony, the company presented evidence that the level of nonjurisdictional sales to AMP–Ohio had decreased during the test year to thirty MW. The company proposed that the commission make adjustments for this decrease in calculating the Beaver Valley 2 allocator, as well as all other allocation factors in this proceeding. The commission rejected the company's proposal, finding that, because the thirty MW level was based upon twelve months of actual data, its use would improperly distort the allocation analysis originally submitted by the company based on six months' actual and six months' estimated data.

The company argues that the decreased level of AMP–Ohio sales should have been adopted in this proceeding because it is more representative of test-year operations. *Franklin Cty. Welfare Rights Org. v. Pub. Util. Comm.* (1978), 55 Ohio St.2d 1, 6, 9 O.O.3d 1, 3, 377 N.E.2d 990, 994. Although there is support in the record for the company's position, the record also supports the commission's finding that the adoption of the decreased sales level would improperly distort the allocation analysis submitted by the company. This court has traditionally deferred to the commission's judgment and expertise in instances where the record supports each of two opposing positions. *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 555 N.E.2d 288; *Dayton Power & Light Co. v. Pub. Util. Comm.* (1962), 174 Ohio St. 160, 21 O.O.2d 427, 187 N.E.2d 150. Being supported by the record, the commission's determination to preserve the integrity of the allocation methodology was well within its lawful discretion. In keeping with precedent, we will not interfere with that discretion by substituting our judgment for that of the commission. Accordingly, the company's first proposition of law is overruled.

## II

At issue under Ohio Edison's second proposition of law is whether the commission was required to include plant in the rate base which the company had neither included in its application, nor otherwise made available for timely investigation by the commission's staff. At the time Ohio Edison filed its application, this property was classified on the company's books as construction work in progress ("CWIP"). Because the company based its rate filing on the accounts of its property in service, it did not include the property at issue in the application, and the commission's staff did not investigate to verify whether the property was used and useful in providing service to ratepayers. R.C. 4909.15(A)(1) and 4909.19.

At the hearing, Ohio Edison presented testimony that the property was actually completed and in service as of date certain, and urged the commission to include it in the rate base. The company explained that the property had not been recorded in an in-service account at the time the application was filed (and thus was not included in the company's initial rate-base calculation) due to the time it takes to transfer completed construction from the CWIP account to an appropriate in-service account. The commission refused to include the property in the rate base because the company did not provide the commission's staff ample time to independently verify the plant's used and useful nature.[1]

The company argues that the staff's independent verification of this plant is not required, because the property's used and useful nature can be established by its witness's testimony and by the staff's general finding, in its report of investigation, that the company's continuing property records are reliable. In *Columbus v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 103, 12 O.O.3d 112, 388 N.E.2d 1237, we upheld the commission's inclusion of property in a utility's rate base under similar reasoning. However, *Columbus* is distinguishable from this case because, here, the company attempted to supplement its application with additional property after the commission had issued its Staff Report of Investigation.

R.C. 4909.19 charges the commission with the duty to investigate "the facts set forth in [the company's rate] application and the exhibits attached thereto * * *." The company's attempt to supplement its application with this additional plant after the issuance of the staff report and its failure to provide timely information with which the commission could verify the plant's status effectively prevented the commission from performing its statutory duty. Under these circumstances, we find the commission's exclusion of this plant to be neither unreasonable nor unlawful. Indeed, if we were to hold otherwise, we would invite the future circumvention of R.C. 4909.19 and the abuses of the ratemaking process which this statute is meant to prevent.

Our holding is consistent with the provision of R.C. 4909.18 which places the burden upon the applicant to prove all issues raised in its application. In this regard, the company appropriately bears the risk that property not included in its application and not made available for timely verification will be excluded from rate base. In *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 449, 457, 12 O.O.3d 378, 383, 391 N.E.2d 311, 315, we reversed the

---

1. Information requested by staff about this property was not made available by the company until approximately three weeks after the commencement of hearing.

commission's inclusion of property in rate base which became used and useful during the test period, but after the date certain, stating:

" * * * The test period, and to some extent the date certain, are determined essentially by the date at which the utility files its application for a rate increase. Any uncertainty which the utility harbors as to the used and useful status of its property, and therefore its includability in the rate base, can be minimized by the careful selection of the date at which the utility chooses to file its application for the rate increase."

In the case before us, Ohio Edison not only had control over the selection of the date certain, R.C. 4909.15(C), but also had control over its record keeping practices. Ohio Edison could have avoided the exclusion of the allegedly used and useful plant from its rate base had it either selected a later date on which to file its application, or had record keeping practices in place that would have eliminated the reporting lag (or better tracked property subject to the lag) which gave rise to this issue. Accordingly, the commission's determination on this issue is affirmed.

### III

Next, Ohio Edison claims that the commission erred by taking judicial notice of the posthearing price at which the company's stock was trading. In calculating the rate of return to be authorized for the company in this proceeding, the commission employed the discounted cash flow ("DCF") model. In determining a representative stock price as a component of the model, the commission departed from its customary use of a twelve-month average, and employed a two-month average in order to take into account a sharp decline in the price of the company's stock. The two-month period adopted by the commission, March 8 through May 4, 1990, produced an average stock price of $19.31.

In its rebuttal testimony offered May 14, 1990, the company contended that a second "price break" occurred with respect to its stock on April 20, 1990. It recommended that the average stock price during the period from April 20 to May 11, 1990 be adopted by the commission as being more representative of investor expectations. During this period, the company's stock traded in the range from $18.25 to $19.75, and averaged $18.85. In considering the company's proposal, the commission took judicial notice that, since the close of the hearing, the price of the company's stock had consistently traded in the range of $20 per share. From this observation, the commission concluded that the second "price break" constituted a short-term fluctuation, rather than a change in investors' long-term expectations, and rejected the company's alternate valuation.

Ohio Edison argues that the commission erred in taking judicial notice of the company's posthearing stock price because the company was not given the opportunity to explain or rebut such evidence at a hearing. *Allen v. Pub. Util. Comm.* (1988), 40 Ohio St.3d 184, 532 N.E.2d 1307; *Forest Hills Util. Co. v. Pub. Util. Comm.* (1974), 39 Ohio St.2d 1, 68 O.O.2d 1, 313 N.E.2d 801. It urges us to reverse the commission on this basis alone and order that its alternate stock price be adopted.

To prevail on this issue, the company must first demonstrate that it has been prejudiced by the commission's action. *Allen, supra; Cincinnati Bell Tel. Co. v. Pub. Util. Comm.* (1984), 12 Ohio St.3d 280, 12 OBR 356, 466 N.E.2d 848. Prejudice cannot be demonstrated merely by showing that the commission erred by taking judicial notice of the company's posthearing stock price. Rather, it must be shown that the stock price adopted was not representative of investors' long-term expectations or, as the company contends, that its alternate stock price was more representative. The company has not made this showing. Indeed, without considering the information noticed by the commission, the evidence of record shows that, as late as May 11, 1990, the company's stock was trading at $19.75 per share. This evidence independently supports the $19.31 valuation adopted by the commission. Accordingly, the commission's determination on this issue is affirmed.

## IV

By its fourth proposition of law, Ohio Edison claims that the commission's revisions to its traditional discounted cash flow ("DCF") model constituted an unjustified departure from commission precedent.[2] Under the traditional model, the commission determined a single-point dividend growth rate, which it used in deriving a single-point baseline cost of equity. It then adjusted the baseline cost of equity to take into account certain other conditions, including issuance costs, dilution, and the need for future financing flexibility. In the past, the adjustment factors for these conditions were 3.2 and 10 percent. Multiplication of the adjustment factors by the baseline cost of equity would

---

2. In making this argument, Ohio Edison relies on *Consumers' Counsel v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 49, 50–51, 10 OBR 312, 313, 461 N.E.2d 303, 304. ("When the commission has made a lawful order, it is bound by certain institutional constraints to justify that change before such order may be changed or modified.") See, also, *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1975), 42 Ohio St.2d 403, 431, 71 O.O.2d 393, 409, 330 N.E.2d 1, 19–20. ("Although the Commission should be willing to change its position when the need therefor is clear and it is shown that prior decisions are in error, it should also respect its own precedents in its decisions to assure the predictability which is essential in all areas of the law, including administrative law.")

produce a range from which the commission would select a point to represent the return on equity which the company would be allowed.

Under the revised model, the commission first develops a dividend growth *range*, rather than a specific, single-point dividend growth *rate*. The adoption of the growth range gives rise to a range for the baseline cost of common equity, rather than the single-point baseline under the traditional method. Under the revised model, an adjustment factor for issuance costs is applied to the cost of common equity range. However, no adjustment is made for dilution, and the adjustment for financing flexibility is considered to be implicitly included in the growth range. Ohio Edison claims that the revised DCF model improperly departs from precedent because it fails to make explicit adjustments for dilution and financing flexibility.

The commission argues that the company has not demonstrated prejudice by the adoption of the revised model. We agree. It is well settled that this court will not reverse an order of the commission on the basis of an error that did not prejudice the party seeking reversal. *Cincinnati v. Pub. Util. Comm.* (1949), 151 Ohio St. 353, 39 O.O. 188, 86 N.E.2d 10; *Ohio Edison Co. v. Pub. Util. Comm.* (1962), 173 Ohio St. 478, 20 O.O.2d 108, 184 N.E.2d 70; *Akron v. Pub. Util. Comm.* (1978), 55 Ohio St.2d 155, 9 O.O.3d 122, 378 N.E.2d 480; *Holladay v. Pub. Util. Comm.* (1980), 61 Ohio St.2d 335, 15 O.O.3d 426, 402 N.E.2d 1175; *Allen v. Pub. Util. Comm.* (1988), 40 Ohio St.3d 184, 532 N.E.2d 1307.

In the case before us, the return on equity selected by the commission (13.21 percent) would be justified under either the traditional or revised model. Specifically, under the commission's traditional model, the single-point cost of equity would have been calculated at 12.13 percent, which, when multiplied by the traditional adjustment factors, would result in a return on equity range of 12.52 to 13.34 percent.[3] This range falls within the 12.37 to 13.39 percent

---

3. This range is calculated using a 1.8 percent growth rate. Ohio Edison's claim of prejudice rests upon its contention that the growth *rate* used in the traditional method should be 2.6 percent, rather than the 1.8 percent referred to by the commission in its order. The 2.6 percent rate is actually the upper end of the growth *range* adopted by the commission's revised model, and would result in a range of return on equity under the traditional method of 13.43 to 14.31 percent, under which the 13.21 percent equity return would be insufficient. To accept that the company has been prejudiced by the adoption of the revised method, we would have to find that the appropriate growth rate under the traditional model should be 2.6 percent. This court has consistently deferred to the expertise of the commission in determining rate of return matters. In *Consumers' Counsel v. Pub. Util. Comm.* (1980), 64 Ohio St.2d 71, 79, 18 O.O.3d 302, 307, 413 N.E.2d 799, 804, we stated:

"Limited judicial review of a rate of return determination is sound for [the] reason that while 'cost of capital analyses * * * have an aura of precision about them, * * * they are fraught

range calculated under the revised method, and the 13.21 percent return ultimately selected falls within the upper quartile of both ranges.[4] Because the return on equity ultimately adopted by the commission is justified under either the traditional or revised model, we find no prejudice in the commission's determination on this issue.

## V

Next, Ohio Edison claims that the "end result" of the commission's order was to set rates so low as to prevent the company from maintaining its financial integrity,[5] resulting in a confiscation of the company's property in violation of the Fifth and Fourteenth Amendments to the United States Constitution. The company's "end result" argument is based upon a long line of federal constitutional cases, beginning with *Fed. Power Comm. v. Hope Natural Gas Co.* (1944), 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

In *Hope,* the United States Supreme Court departed from its traditional detailed scrutiny of the methodology under which public utility rates are set, to a more deferential standard of review. With respect to this standard, the court stated:

" * * * [I]t is the result reached [by the rate order] not the method employed which is controlling. * * * It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry * * * is at an end. * * * And he who would upset the rate order * * * carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." 320 U.S. at 602, 64 S.Ct. at 287–288, 88 L.Ed. at 345.

In determining whether a rate order is just and reasonable (and thus constitutionally permissible), the court in *Hope* required a balancing of investor and consumer interests. With respect to the investors' interest, the court stated:

" * * * [t]he investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor

---

with judgments and assumptions.' *Re Dayton Power & Light Co.* (March 9, 1979), case No. 78–92–EL–AIR, at page 26. * * * "

Accordingly, we defer to the commission's judgment that, under the traditional model, a growth rate of 1.8 percent should be used.

4. The upper quartile under the revised method would begin at 13.135 percent. Under the traditional method it would begin at 13.143 percent.

5. Ohio Edison's claim is based upon its witness's testimony that the rate relief requested in the company's application ($216 million) is necessary to maintain its debt rating and dividend level.

or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. * * * By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." 320 U.S. at 603, 64 S.Ct. at 288, 88 L.Ed. at 345.

The Court, in *Permian Basin Area Rate Cases* (1968), 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312, restated its decision in *Hope,* finding:

" * * * [T]he just and reasonable standard of the Natural Gas Act 'coincides' with the applicable constitutional standards, *FPC v. Natural Gas Pipeline Co.* [ (1942), 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037] at 596, [62 S.Ct. at 747–748, 86 L.Ed. at 1055], and any rate selected by the Commission from the broad zone of reasonableness[6] permitted by the Act cannot properly be attacked as confiscatory. Accordingly, there can be no constitutional objection if the Commission, in its calculation of rates, takes fully into account the various interests which Congress has required it to reconcile. * * * [R]ates, determined in conformity with the Natural Gas Act, and intended to 'balanc[e] * * * the investor and the consumer interests,' are constitutionally permissible. * * *" 390 U.S. at 770, 88 S.Ct. at 1361, 20 L.Ed.2d at 338.

With respect to the balance which must be struck by the regulatory body in its deliberations, the court in *Permian Basin* stated:

"The Commission cannot confine its inquiries either to the computation of costs of service or to conjectures about the prospective responses of the capital market; it is instead obliged at each step of its regulatory process to assess the requirements of the broad public interests entrusted to its protection by Congress. Accordingly, the 'end result' of the Commission's orders must be measured as much by the success with which they protect those interests as by the effectiveness with which they 'maintain * * * credit and * * * attract capital.' " (Footnote omitted.) 390 U.S. at 791, 88 S.Ct. at 1372–1373, 20 L.Ed.2d at 350.

We considered the above constitutional cases in some detail in *Dayton Power & Light Co. v. Pub. Util Comm.* (1983), 4 Ohio St.3d 91, 4 OBR 341,

---

6. The "broad zone of reasonableness" has generally been recognized as the range between which a range would be so low as to be confiscatory and so high as to be exploitative of consumers. *Washington Gas Light Co. v. Baker* (D.C.Cir.1950), 188 F.2d 11, certiorari denied (1951), 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686.

447 N.E.2d 733 ("*DP&L*"). There, in considering the balance required to be struck, we stated:

" * * * the General Assembly has adopted a consistent position in balancing investor and consumer interests in utility ratemaking. Pursuant to the statutory ratemaking formula investors are assured a fair and reasonable return on property that is determined to be used and useful, R.C. 4909.-15(A)(2), plus the return of costs incurred in rendering the public service, R.C. 4909.15(A)(4), while consumers may not be charged 'for utility investments and expenditures that are neither included in the rate base nor properly categorized as costs.' [Footnote omitted.] We see no constitutional infirmity in the balance thus struck by the General Assembly." 4 Ohio St.3d at 103, 4 OBR at 352, 447 N.E.2d at 743.

In *DP&L*, we concluded:

"To prevail [on issues of confiscation], appellant must prove not only the unreasonableness of the [underlying statutory · determinations] but also the confiscatory effect [these determinations] had on the rates established by the commission, viewing the rate order 'in its entirety.' *Hope Natural Gas Co., supra* [320 U.S.] at page 602 [64 S.Ct. at 287, 88 L.Ed. at 345]. * * *" 4 Ohio St.3d at 106, 4 OBR at 354, 447 N.E.2d at 745.

Ohio Edison premises its claim of confiscation upon the commission's allegedly erroneous statutory determinations discussed in the company's first four propositions of law. Because we have upheld the commission with respect to each of these determinations, the company's claim must fail under the first prong of the standard articulated in *DP&L*.

Even though Ohio Edison acknowledges that *DP&L* is controlling in this case, it argues that *Hope's* "end result" test requires the commission to consider the effects of its rate order on the company's financial integrity, irrespective of the appropriateness of the underlying statutory determinations.[7] To accept the company's position, we would have to ignore the "broad public interests" recognized in *Permian Basin* and raise the investor concerns

7. Ohio Edison cites the United States Supreme Court's recent decision in *Duquesne Light Co. v. Barasch* (1989), 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646, as being supportive of its "end result" approach. There, the utility challenged a Pennsylvania law under which expenditures for a plant which never became "used and useful" were excluded from ratemaking. The court held that "a state scheme of utility regulation does not 'take' property simply because it disallows recovery of capital investments that are not 'used and useful in service to the public.'" 488 U.S. at 301–302, 109 S.Ct. at 612, 102 L.Ed.2d at 653. This narrow holding merely reaffirmed the court's finding in *Hope* that it will not inquire into the particular methodology under which rates are set. Thus, we see no reason, on the basis of this holding, to construe *Duquesne* as broadly as Ohio Edison urges, and in a manner which we find to be inconsistent with the express language of *Hope* and its progeny.

listed in *Hope* to a constitutional level. The federal constitutional cases do not support such a result.[8] Rather, these cases recognize investor concerns as only one factor that the commission is to consider in setting just and reasonable (*i.e.*, constitutional) rates. Once these interests are appropriately balanced, the rates' effect on the company's financial integrity (*i.e.*, debt rating and dividend level) is but another of the risks which a utility, as any other unregulated enterprise, must bear.[9]

Accordingly, we reaffirm our interpretation of the federal constitutional cases as stated in *DP&L*. Under that interpretation, the record shows that the commission appropriately followed the legislatively mandated ratemaking formula, through which it balanced investor and consumer interests, and thereby set just and reasonable rates. Inasmuch as the company has failed to carry its "heavy burden" of showing that the rates set in this proceeding were "unjust and unreasonable" (*i.e.*, confiscatory), its fifth proposition of law is overruled.

## VI

Finally, Ohio Edison claims that the commission erred by adopting a nuclear performance standard in this case. The standard has not been applied to the company, but is to be employed in future electric fuel component proceedings, which are governed by R.C. 4909.191. IEC and the commission argue that, because this standard has yet to be applied to Ohio Edison, the issue is not a justiciable one. We agree.

---

8. In *Hope*, the court recognized that " 'regulation does not insure that the business shall produce net revenues,' " 320 U.S. at 603, 64 S.Ct. at 288, 88 L.Ed. at 345, quoting *Fed. Power Comm. v. Natural Gas Pipeline Co.* (1942), 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed.2d 1037, 1052, and in the latter case the court stated that "the hazard that the property will not earn a profit remains on the company in the case of a regulated, as well as an unregulated, business." *Id.* See, also, *Market Street Ry. Co. v. RR. Comm. of California* (1945), 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (regulation does not insure a utility's profit). From a review of this language, the Supreme Court of Pennsylvania stated that "[s]ince the risk of nonprofitability remains upon regulated utility companies, it follows that the consequence of that lack of profitability, to wit diminished financial integrity, also rests upon utility companies." *Pennsylvania Elec. Co. v. Pennsylvania Pub. Util. Comm.* (1985), 509 Pa. 324, 332, 502 A.2d 130, 134, appeal dismissed for want of substantial federal question *sub nom. Metropolitan Edison Co. v. Pennsylvania Pub. Util. Comm.* (1986), 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687. Indeed, in *DP&L* we stated that the court's summary dismissals of repeated appeals on this issue suggest that the court has implicitly recognized that " 'the Constitution no longer provides any special protection for the utility investor.' " (4 Ohio St.3d at 100, 4 OBR at 349, 447 N.E.2d at 740, quoting Bernstein, Utility Rate Regulation: The Little Locomotive That Couldn't [1970], Wash.U.L.Q. 223, 259–260.)

9. We also note that the commission appropriately considered the risk of investing in the utility through application of its DCF model.

In *Zangerle v. Evatt* (1942), 139 Ohio St. 563, 23 O.O. 52, 41 N.E.2d 369, we held that a statute which granted appeals as of right to this court from the determinations of an administrative agency applied only to quasi-judicial, and not quasi-legislative, proceedings. In the first and fifth paragraphs of the syllabus we stated:

"1. The revisory jurisdiction of the proceedings of administrative officers authorized by Section 2, Article IV of the Ohio Constitution, contemplates *quasi*-judicial proceedings only."

"5. Courts will not aid in making or revising rules of administrative officers, boards or commissions, being confined to deciding whether such rules are reasonable and lawful *as applied* to the facts of a particular justiciable case." (Emphasis added.)

We subsequently applied *Zangerle* in *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 51 O.O.2d 35, 257 N.E.2d 371, and *Craun Transp., Inc. v. Pub. Util. Comm.* (1954), 162 Ohio St. 9, 53 O.O. 451, 120 N.E.2d 436. In the latter case, we recognized that the promulgation of rules by the commission was a quasi-legislative act and dismissed the appeal arising out of the adoption of such rules, stating:

"As there has been no attempt to enforce the rules against the appellants, they have not been affected by the rules in any way, and the validity of the rules can be determined only when that question arises in connection with a matter that is justiciable. Consequently, the appeal is premature." 162 Ohio St. at 10, 53 O.O. at 452, 120 N.E.2d at 437.

In the case before us, the commission's adoption of the nuclear performance standard was a quasi-legislative act. On authority of the above cases, we hold that, because the standard has yet to be applied to the company, the appeal on this issue is premature and, therefore, is dismissed.

*Order affirmed.*

SWEENEY, DOUGLAS, H. BROWN and RESNICK, JJ., concur.

MOYER, C.J., concurs in part and dissents in part.

HOLMES and WRIGHT, JJ., dissent.

MOYER, C.J., concurring in part and dissenting in part. I concur in Parts I and III of the dissent of Justice Wright and concur in the majority opinion to the extent that it is not inconsistent with those portions of the dissent.

WRIGHT, J., dissenting. Because I believe that the commission and in some measure the majority have ignored the salient facts of this case and the ruling case law, I must respectfully dissent.

## I

I dissent from the majority's conclusion that the commission was justified in refusing to adjust the return on equity to compensate for the dilution of stock prices caused by issuing additional stock, sometimes referred to as market pressure. The commission examined this issue in great detail in *Cincinnati Gas & Elec. Co.* (Mar. 18, 1981), PUCO No. 80–260–EL–AIR, 42 PUR 4th 252, 288–289, and determined that an adjustment was necessary. The commission reiterated its position in *Dayton Power & Light Co.* (July 15, 1981), PUCO No. 80–687–EL–AIR, unreported, at 36. The commission is now willing to abandon its earlier position based on its staff's comment that dilution is a disputed response. The commission has clearly not sufficiently justified its change from a sound position as enunciated in earlier cases concerning similar facts and theories. See *Consumers' Counsel v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 49, 51, 10 OBR 312, 313, 461 N.E.2d 303, 305. A change in the long-accepted method of calculating the return on equity requires detailed fact-finding and some measure of consideration. I would reverse and remand on this limited issue.

## II

Secondly, I write to clarify the proper test when a company claims that the commission's rate is so low that it threatens the company's financial integrity. The commission misconstrues both the nature and purpose of the "end result" test. Its opinion and order characterized Ohio Edison's argument as an attempt to justify a higher rate to attain certain financial goals. Be that as it may, the real issue is whether the rate set is so low as to be confiscatory, and thus in violation of the company's right to due process of law. The United States Supreme Court has clearly stated that whether a rate is just and reasonable depends *not* on a review of the theory used to determine the rate, but whether the total effect is just and reasonable. *Fed. Power Comm. v. Hope Natural Gas Co.* (1944), 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345. The court stressed that "[r]ates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid * * *." *Id.* at 605, 64 S.Ct. at 289, 88 L.Ed. at 346.

In *Duquesne Light Co. v. Barasch* (1989), 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646, the court approved a statutory ratemaking method that denied amortization of costs incurred for nuclear power plants that were never placed into operation, but noted that neither of the utility companies involved "alleges that the total effect of the rate order arrived at within this system is unjust or unreasonable." *Id.* at 310–311, 109 S.Ct. at 617–618, 102 L.Ed.2d at

659. After discussing the impact of denying the amortization of these investments on the companies' rate base, rate of return, and annual revenue allowance, the court concluded that "[t]he overall impact of the rate orders, then, is not constitutionally objectionable. *No argument has been made that these slightly reduced rates jeopardize the financial integrity of the companies, either by leaving them insufficient operating capital or by impeding their ability to raise future capital.*" (Emphasis added.) *Id.* at 312, 109 S.Ct. at 618, 102 L.Ed.2d at 660.

Similarly, *Dayton Power & Light Co. v. Pub. Util. Comm.* (1983), 4 Ohio St.3d 91, 4 OBR 341, 447 N.E.2d 733, does *not* stand for the proposition that the commission need not apply the end result test to the company's claim. In that case this court made it very clear that the power company presented no evidence for its contention that it was unable to earn a fair and reasonable rate of return. *Id.* at 104–106, 4 OBR at 353–354, 447 N.E.2d at 744–745.

The important difference between the cases discussed above and this case is that Ohio Edison *did* offer evidence that the proposed rate would impede its ability to obtain credit and attract capital. This case squarely raises the issue of the commission's role and the court's standard of review when the company claims that the rate threatens its financial integrity.

I am persuaded by the comprehensive and incisive reasoning employed by the District of Columbia Circuit Court of Appeals in *Jersey Cent. Power & Light Co. v. Fed. Energy Regulatory Comm.* (D.C.Cir.1987), 810 F.2d 1168 (en banc). That court emphasized that although its determination is given great deference, the Federal Energy Regulatory Commission has a duty to make findings of fact on the overall impact of its rate when a company claims that the rate is confiscatory. *Id.* at 1177–1178. These findings of fact enable a court to review the commission's findings and determine whether or not it abused its discretion. *Id.* at 1181–1182.

The commission did not adequately address the effects of its actions on the financial integrity of the company, or whether the rate works a confiscation of property. Ohio Edison presented evidence that its bond ratings were at the bottom range of investment quality and that its interest coverage ratios were substandard even for that rating category. The company testified that its ability to attract capital and obtain credit would be damaged by the reduced rates. The commission had a duty to at least consider the total effect of the rate that it granted; I would reverse and remand on this limited issue.

## III

As part of the ratemaking process, the commission separates the utility's costs and rate base between retail customers and other customers that are not

subject to the commission's jurisdiction. The commission calculated the Beaver Valley 2 allocation factor as 86.2 percent, based on nonjurisdictional sales of three hundred eighty-seven megawatts of capacity to Potomac Electric Power Company ("PEPCO") and one hundred twenty-five megawatts to American Municipal Power–Ohio, Inc. ("AMP–Ohio"). The commission took these figures from Ohio Edison's rate application. The sales to PEPCO were annualized at three hundred eighty-seven megawatts, even though sales were not at that level throughout the test year, because that number best represented sales in the future years. Likewise, the AMP–Ohio sales were annualized at one hundred twenty-five megawatts based on future expected sales. The AMP–Ohio sale was being negotiated at the time that Ohio Edison completed its application. AMP–Ohio did not purchase the amount of capacity originally anticipated by Ohio Edison and the commission, however, and therefore Ohio Edison correctly contends that thirty megawatts is the correct level of sales. With this adjustment, the Beaver Valley 2 allocation factor would be 89.1 percent. If this allocation factor and all other affected allocation factors are revised, the company's revenue requirements increase by $30 million.

For these reasons I simply cannot adopt the majority's position that the commission's failure to adjust the allocation percentage for the reduced sales to AMP–Ohio was reasonable. The PEPCO sales figure is *not* based on six months of actual data and six months of estimated data for the test year, but the commission is perfectly willing to allow the company to use a representative, and higher, figure. The commission then unreasonably balks at allowing the company to use a truly representative, but lower, number for the AMP–Ohio sales. I would reverse and remand on this limited issue.

For the above reasons, I respectfully dissent from the judgment of the court.

HOLMES, J., concurs in the foregoing dissenting opinion.